**Laura R. MAZZELLA, Plaintiff,**

v.

**RCA GLOBAL COMMUNICATIONS, INC. and RCA Communications, Inc., Defendants.**

No. 83 Civ. 3716 (WCC).

United States District Court, S.D. New York.

Sept. 10, 1986.

McKenna & Schneier, Valley Stream, N.Y., for plaintiff; Patrick Michael McKenna, Alan N. Schneier, of counsel.

Proskauer Rose Goetz & Mendelsohn, New York City, for defendants; Bettina B. Plevan, Elizabeth A. Alcorn, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff Laura Mazzella ("Mazzella") brought this action against her former employer, RCA Global Communications, Inc. ("Globcom"), for alleged violations of title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1982), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1982).[1] Mazzella raises four claims: (1) that Globcom summarily discharged her on December 14, 1981 in whole or in part because she was pregnant; (2) that the terms of her discharge were less favorable than those routinely accorded to similarly situated male employees; (3) that Globcom requires female employees who become pregnant to advise the company of their pregnancy as soon as possible, and that this requirement violates title VII; and (4) that for no legally justifiable reason

her male replacement was paid a higher salary for doing the same job.

This case was tried before the Court sitting without a jury. At the close of the trial, the parties agreed to submit posttrial memoranda, which I have carefully reviewed. This Opinion and Order constitutes my findings of fact and conclusions of law as required by rule 52(a), Fed.R. Civ.P. For the reasons set forth below, I conclude that Mazzella has failed to prove her claims by a fair preponderance of the credible evidence, and consequently, her complaint must be dismissed. I shall address each of Mazzella's contentions in the order set out above.

### I. Mazzella's Discharge

Plaintiff's first contention is that she was discharged from her job with Globcom in whole or in part because she was pregnant. In connection with this claim, I make the following findings of fact:

#### A. Findings of Fact

Mazzella was a female employee at Globcom from April 1971 through December 14, 1981. She graduated from high school in 1968 and then attended secretarial school for 10 months. She has no college education nor has she taken any academic or business related courses since completing secretarial school.

Mazzella joined Globcom as a secretary, and was promoted a number of times. These promotions culminated in her elevation in 1975 to the position of sales representative in the Satcom marketing department with a pay grade of 43. Tr. at 137–38, 195–96; see PX 2, PX 4. By her own admission, Mazzella had problems performing as a sales representative, and she was removed from that position. Tr. at 196–97.

In March 1976, she secured a transfer to the Industrial Relations ("IR") or personnel department with no reduction in salary or pay grade. Tr. at 139, 197–98; PX 2.

1. Mazzella also sued Globcom's parent corporation, RCA Communications, Inc. By Stipulation and Order dated September 2, 1984, Mazzella agreed to dismiss the action against RCA Communications, Inc. with prejudice and without costs.

Mazzella had no training, educational background, or prior experience in personnel work. Tr. at 136–37, 199.

Plaintiff's first work in the IR department was in the records section. Tr. at 139, 198. In 1977, she was transferred to the department's benefits section, where she was primarily responsible for processing medical insurance claims. Tr. at 141. Both jobs were essentially clerical in nature. Tr. at 198–99, 529.

While in these positions, Mazzella was an adequate, but not outstanding employee. Each year Mazzella received a merit pay increase, see PX 2, but not as large an increase as other employees and not as much as plaintiff thought appropriate, tr. at 205–06. Mazzella's immediate supervisor in the benefits section, John Farber, was generally satisfied with her work, but Farber's supervisor, Dominick Zurlo, was critical of Mazzella's performance. He found that she spent too much time on personal telephone calls, socialized too much during working hours, was late in processing claims, and took excessively long lunch breaks. Tr. at 483–84.

It is clear, however, that Mazzella had the potential to perform ably when she chose to do so. Globcom received several letters from persons inside and outside the company praising Mazzella's performance. Indeed, even Zurlo indicated that he believed that Mazzella "was a very bright person and that she knew how to do [her job] if she put her mind to it." Tr. at 486. But whether she had the potential or not, it is clear that more than one or two people believed that Mazzella's actual performance left something to be desired. Mazzella herself admitted that the then Vice President of Industrial Relations, Robert McHenry, was dissatisfied with her work and was trying to remove her from the department. Tr. at 214.

In June 1979, plaintiff transferred to the department's employment section, where she reported to Richard Wilder, the Manager of Employment and Records. Tr. at 141, 142. Mazzella's title was Industrial Relations Representative and she was responsible for recruiting new employees. This was the first position in which Mazzella had significant professional level responsibilities. Charles Twitty, the new Vice President of Industrial Relations, found Mazzella's performance during this period adequate. Tr. at 419–21.

On December 27, 1980, plaintiff married, and in January 1981, she became pregnant. The pregnancy was a difficult one, and Mazzella went on a medical leave of absence beginning in March 1981. Tr. at 149. Globcom had a liberal pre-disability and disability leave policy. An employee could take an unpaid pre-disability leave any time prior to an anticipated disability. See PX 7. A pregnant employee was entitled to a paid maternity leave for four weeks before and six weeks after a child's birth. Tr. at 402. Such an employee was entitled to return to her same or a similar job after this ten-week period. Tr. at 402–03, 456–57. Of the 42 Globcom employees who took a maternity leave between 1979 and 1983, each either returned to the same or a similar job with no reduction in salary, or resigned voluntarily while on leave. None was discharged. See Tr. at 461–63; DX LL.

Mazzella suffered a miscarriage, and returned to her job on May 26, 1981. Tr. at 149–50. Upon her return, Mazzella's immediate supervisor was Alvin Silverstein. Wilder had resigned from Globcom just before Mazzella went on her disability leave, and Silverstein was hired to replace him as Manager of Employment and Records. Tr. at 150, 287. Silverstein testified that his new job was not a career step upwards, and conceded that one could reasonably argue that it was, in fact, a step down from his previous position. Tr. at 393–94.

When Silverstein was hired, Globcom's President, Valerian Podmolik, informed him that he was expected to improve the company's personnel activities. Specifically, Podmolik directed Silverstein to put the employment activities on a par with the company's technical accomplishments, to increase the speed of recruiting, and to

create a personnel department that Podmolik could be proud of. Tr. at 286.

From May 1981 through Mazzella's discharge on December 14, 1981, the employment section was essentially a three-person operation consisting of Silverstein, Mazzella, and a woman named Nancy Charles. Silverstein managed the unit and did recruiting for certain upper-management and engineering positions. Tr. at 294–95. Mazzella and Charles shared the balance of the work. *See* PX 13. Mazzella was responsible for recruiting new employees for marketing, engineering, operations, union, Globcom Systems, Inc., and international services positions. In addition, she was responsible for ordering employee service awards, helping to organize the 25–year award dinner, approving employee "family store" purchases, organizing the annual savings bond drive, logging employment requisitions, running the job-posting program, and developing an employee orientation program and employee handbook. Tr. at 291–93. Charles, on the other hand, was responsible for recruiting new employees for computer programming and financial department positions. She was also responsible for running the employee suggestion program, arranging employee relocations, making periodic reports to the Equal Employment Opportunity authorities, and recruiting students for the Minorities in Engineering Program. Tr. at 288–91. While Mazzella was responsible for a greater number of assignments, the amount of work she had to do was roughly equal to the amount Charles had to do. Tr. at 287–88. Both Mazzella and Charles were expected to spend about 90 percent of their time on recruiting.

In July 1981, Silverstein met with Mazzella to present her scheduled annual salary increase, the amount of which had been previously determined by Wilder, Silverstein's predecessor. Tr. at 295. Silverstein had been informed that, under company policy, he could defer granting Mazzella the increase because she had been absent for several months on medical leave. Tr. at 151, 295. However, he decided to give Mazzella the pay raise because he thought it was important to start his relationship with plaintiff off on the right foot. When Silverstein informed Mazzella that she would receive a salary increase, she initially expressed surprise, stating that she had not expected to receive the raise. Tr. at 295. But before the meeting was over, Mazzella began to express disappointment with the size of the increase. *Id.* Silverstein responded that there was room for growth within her salary grade, and that if her performance warranted it, he could recommend her promotion to a higher salary grade. Tr. at 296.

But beginning in June 1981 and continuing through plaintiff's discharge in December 1981, Silverstein became cognizant of many deficiencies in Mazzella's work performance. These included problems in nearly every area of Mazzella's responsibilities. For example, in the recruiting area, in the early summer of 1981, Mazzella was assigned to recruit bench technicians for Globcom's Edison, New Jersey facility. Tr. at 305–08. Silverstein instructed Mazzella to contact military outplacement centers and technical schools in order to locate technicians trained on the same type of equipment Globcom used. Tr. at 308. Mazzella never did so. *Id.* On another occasion, plaintiff was assigned to assist with a Sunday-morning "open house" to recruit technical programmers. She arrived late, apparently hungover, and Silverstein had to send her home. Tr. at 311–12.

In addition to these first-hand observations, Silverstein and his immediate supervisor, Charles Twitty, frequently received complaints from department managers about Mazzella's recruiting activities. For instance, a number of managers complained to Silverstein that Mazzella did not keep them adequately informed about the progress of efforts to fill their staff openings. Tr. at 304, 308. One embarrassing incident arose because Mazzella did not advise a manager, Tony Falco, that an engineer scheduled to begin working for him had withdrawn his acceptance of Globcom's employment offer. Falco approached Silverstein on the day the engineer was to

have started work and asked why he had not appeared. It was only after Silverstein asked Mazzella what had happened that he learned that the employee was not coming—which Silverstein then had to explain to Falco. Tr. at 308–09.

Twitty heard complaints that Mazzella failed to screen resumes appropriately. For instance, Joe Terry Swaim, a Vice President of Engineering, complained that managers in his department were being sent job applicants whose applications had obviously not been screened because the applicants had no qualifications for the particular position at issue—such as teachers applying for engineering software positions. Tr. at 423.

Silverstein received complaints that Mazzella did not perform recruiting functions promptly. One such incident involved an engineer employed by another company who had contacted John Shields, Globcom's Engineering Director, and expressed interest in joining Globcom. Shields complained to Twitty that while he had asked Mazzella on several occasions to contact this prospect and schedule an interview, she had not done so. Twitty relayed Shields' complaint to Silverstein and directed him to tell Mazzella to schedule an interview. Approximately one week later, Shields again complained to Twitty that plaintiff had not contacted this applicant. Tr. at 424–25.

Silverstein also received an irate complaint from Nick Bafitis, Globcom's Administrator of Labor Relations, that Mazzella had rehired Barbara Yacullo, who previously had been terminated by Globcom for poor performance. Yacullo's discharge had presented a sensitive situation for the company because her husband was a union officer also employed by Globcom, and the company had no interest facing the same situation again. Mazzella contended at trial that Bafitis had approved her decision to rehire Yacullo. I find this contention incredible.

Silverstein received complaints about Mazzella's performance of her other job functions as well. Early in the summer of 1981, Globcom's president directed Silverstein to develop a job-posting program for the company's employees. Tr. at 312–13. Openings within the company were to be posted on a special bulletin board and interested employees were invited to submit applications to the employment section. The applications were then to be screened and applicants with appropriate qualifications were to be referred to the requesting manager for an interview. Tr. at 313. Applicants who were not selected for an interview, or who were not chosen for the job after an interview, were supposed to be informed why they were rejected, how they might improve their qualifications, and why the successful candidate had been chosen. Tr. at 313–14.

In the summer of 1981, Mazzella asked Silverstein to give her responsibility for the job-posting program, which had not yet been instituted. Silverstein commented that she seemed to have a "full plate" already, but Mazzella assured him that she would be able to handle it, and wanted very much to undertake this responsibility. Tr. at 153–54, 236, 314. Silverstein acceded to Mazzella's request.

However, after Mazzella assumed responsibility for the program, Silverstein received complaints from managers that plaintiff was not screening applicants for appropriate qualifications. Tr. at 316. Silverstein also heard complaints that rejected applicants were not receiving feedback from Mazzella and that announcements that jobs had been filled were not being made. *Id.* He also received reports that jobs had not been posted because Mazzella lost or misplaced the requisitions. *Id.* Finally, Silverstein was the recipient of what he described as a "very nasty visit" from President Podmolik concerning the job-posting program. *Id.* Pokmolik came into Silverstein's office and directed Silverstein to accompany him to the hallway where the job-posting bulletin board was located. Once there, Podmolik complained that the bulletin board was an untidy and unprofessional "mess," and ordered Silverstein to straighten it up immediately. Tr. at 316–17.

Mazzella was also responsible for the company's service award program. With this program, Globcom recognized and rewarded those employees who had given long service to the company. Employees who were about to attain a significant anniversary date in their history with the company were sent a catalogue from which they could select an award. Some of the awards available to long-time employees were expensive items, such as mantle and wall clocks and watches. Tr. at 320, 323. Mazzella was responsible for ordering the award selected by the employee and ensuring that it was sent to the employee's manager in time for presentation to the employee on his or her anniversary date. Tr. at 222–23.

Silverstein and Twitty received numerous complaints about plaintiff's administration of the service awards program. The most embarrassing incident occurred when Mazzella failed to send a 30–year service award to President Podmolik for presentation to Larry Codacovi, an Executive Vice President reporting directly to Podmolik. Podmolik complained to Twitty in an extremely irate tone that he had been embarrassed when Codacovi reminded him that Codacovi's anniversary date had passed without the presentation of an award. Tr. at 318–19, 421. Twitty in turn severely criticized Silverstein for this foul-up. *See* PX 26 at 157.

There were other complaints as well. Managers in New Jersey, California, and Puerto Rico complained to Silverstein and Twitty about late service awards, sometimes repeatedly. Tr. at 319–23, 422. Indeed, even Twitty himself complained because his own 25–year service award, a watch he received in late 1980, had the wrong date engraved on it. Tr. at 422.

There were also problems with Mazzella's maintenance of service awards. She stored approximately ten expensive mantle clocks in her office, a partitioned space with no door, that could not be secured. Tr. at 323. Silverstein repeatedly asked plaintiff to move the clocks to an area where they could be locked up. Twitty

also commented several times to Silverstein about this problem. *Id.* Mazzella, however, did nothing, and Silverstein was finally forced to move the clocks himself. Tr. at 323–24. Mazzella also failed to notice that a drawer in which other service awards were stored was broken and could no longer be locked. Silverstein asked her to have the lock repaired, but she never did so, and continued to store the awards there, unsecured. Tr. at 365. Silverstein also requested that Mazzella prepare an inventory of the service awards, but she never completed it. *Id.*

Plaintiff was responsible during the early summer of 1981 for coordinating Globcom's United States Savings Bond drive. The union was to participate in the savings bond campaign, and Silverstein directed Mazzella to include him in all meetings with the union and the government representative so that no problems with the union would arise. Tr. at 324. However, plaintiff did not advise Silverstein of her scheduled meetings with the union, and Silverstein later learned that Mazzella had agreed to distribute cigarette lighters bearing the initials of the company and the union to some campaign participants. Tr. at 325. Silverstein strongly objected to the inclusion of the union initials on these lighters because the company alone had paid for the lighters and the bond campaign was a company effort. *Id.* Mazzella attempted to excuse her actions by arguing that someone at least at the vice president level had to approve of her decision to distribute the lighters in order for it to be effectuated. Whether this is true or not, it did not excuse Mazzella's failure to advise Silverstein of her meetings with union officials as she had been directed to do.

Twitty also received complaints about Mazzella's work on the saving bond drive. Henrietta Greco, President Podmolik's administrative assistant, complained to Twitty about a bond drive coodinators' meeting plaintiff had chaired. Greco complained that the meeting was poorly planned and presented, that instructions to coordinators were poorly handled, that the necessary

materials were not ready, and that the meeting generally was not well organized. Tr. at 423.

Early in the summer of 1981, Silverstein directed Mazzella to develop a revised orientation program for new employees. Tr. at 325–26. She failed to complete this assignment, or even make reasonable progress on it, despite numerous requests. Tr. at 327–29. Similarly, Silverstein asked plaintiff to draft an employee handbook. Tr. at 329. Again, Mazzella did nothing with respect to this assignment. Tr. at 330.

Perhaps Silverstein's biggest complaint about plaintiff's performance concerned her poor attitude and work habits. There is no dispute that the employment section had an extremely heavy workload during 1981. Tr. at 287, 294. Mazzella, however, would not devote even the company's full 8:30 a.m. to 4:30 p.m. business day to accomplishing her assigned tasks. She often arrived at work after 8:30 a.m., immediately went to the company cafeteria for coffee, spent time on personal telephone calls, took long lunches, and left promptly at 4:30 p.m. or earlier. Tr. at 300–01, 429. In contrast, the other employees in the section often worked overtime. Silverstein was overworked and did a considerable amount of the recruiting himself. Tr. at 294–95. Nancy Charles, Mazzella's co-worker in the section, arrived early in the morning, often ate lunch at her desk or had no lunch at all, and worked into the evenings and over the weekends. Tr. at 301, 470. Larry Howard, who assumed some of Mazzella's recruiting duties upon her discharge, adhered to the same type of work schedule. *Id.* Patricia Salter, Silverstein's secretary, also worked into the evenings and came into the office on weekends. Tr. at 470.

In July or August 1981, Silverstein began to have informal discussions with Mazzella about these performance problems. Tr. at 302. These discussions continued throughout the fall of 1981, tr. at 302, 469–70, but Silverstein saw no improvement in plaintiff's attitude or performance.

On October 29, 1981, Mazzella learned that she was pregnant again. That day, she filed an insurance claim with the benefits section of the IR department indicating that she was pregnant. PX 45. Mazzella also informed many of her co-workers in the IR department. However, Silverstein did not learn of Mazzella's pregnancy until November 6, 1981 when Mazzella informed him of it. Tr. at 339. Twitty also did not learn of plaintiff's pregnancy until November 6, 1981, when Silverstein mentioned it to him. Tr. at 428.

Having observed no improvement in plaintiff's attitude or work performance, Silverstein held a formal meeting with her on November 3, 1986. Tr. at 302–03. Silverstein reviewed with Mazzella her performance deficiencies to date, and informed her that she would be terminated if her performance did not improve. Tr. at 331.

On November 6, 1981, at plaintiff's request, Silverstein and Mazzella met again. Tr. at 162, 338. They reviewed the matters discussed at the November 3 meeting, and Silverstein reiterated that if plaintiff's performance did not improve, she would be discharged. Tr. at 338. Nonetheless, Silverstein was encouraging, and the meeting ended on a positive note. Tr. at 340. As she left Silverstein's office, Mazzella remarked to Silverstein, "Oh, by the way, I'm pregnant." Tr. at 340. As noted above, this was the first Silverstein learned of Mazzella's pregnancy.

Silverstein observed no improvement in plaintiff's attitude or performance following the November 3 and November 6 meetings. Growing increasingly concerned that Mazzella had not realized the seriousness of the situation, on November 16, 1981, Silverstein sent her a written memorandum. Tr. at 341. In his memorandum, Silverstein reviewed that he perceived to be the most critical deficiencies in Mazzella's performance. In his concluding paragraph, he stated:

[C]onsidering the seriousness of the above, *I am repeating in writing what I have already stated to you verbally. This is: the performance deficiencies we*

*have discussed must be rectified imme-diately or I will have no choice but to remove you from your position.*

PX 12 (emphasis added).

On November 17, 1981, Mazzella responded in a written memorandum. She acknowledged that they had previously discussed at least some of the deficiencies in Silverstein's memorandum. However, Mazzella took issue with Silverstein's assessment of her performance and complained that the work load in the section was unevenly distributed between her and her co-worker, Nancy Charles. *See* PX 13.

Silverstein responded in a memorandum dated December 4, 1981. He reviewed three items that Mazzella had failed to attend to as directed. One of these matters was the employee orientation program. Silverstein noted that he had given Mazzella a deadline of December 4, 1981 to prepare and submit to him an outline of how she intended to proceed with the project, and that Mazzella had agreed to abide by that deadline. He stated that as of that date, however, he had not received the outline. PX 14 at 1.

Silverstein further indicated that he did not believe that the work load in the section was unevenly distributed. While remaining firm in his insistence that Mazzella improve her performance, Silverstein again adopted an encouraging tone. He noted that a third recruiter would be joining the section in a few weeks, and that assignments within the section would be changed. He cautioned, however, that with the addition of a third recruiter, more time would have to be spent on doing "a more thorough and professional job in each of the duties assigned." *Id.* at 4. Silverstein concluded by stating that he wanted to be able to count on Mazzella's participation in this effort, but that if her performance did not improve, he would have no alternative but to dismiss her. *Id.*

The third recruiter Silverstein referred to in his memorandum was Larry Howard, a male employee. Howard transferred into the employment section in November 1981, but did not assume any recruiting responsi-bilities until Mazzella was discharged in December 1981. Tr. at 382. Howard was inexperienced in recruiting, and required a substantial amount of time to learn the skills necessary to perform his recruiting responsibilities. Tr. at 386.

At the time Silverstein sent his November 16, 1981 memorandum to Mazzella, he had not yet made a decision to terminate her, but he was getting close to it. Tr. at 344–45. His previous measures were having no effect, and he was beginning to receive criticism from his superiors about the department's performance. Tr. at 345.

Mazzella was out ill on December 7 and 8, 1981. Silverstein was annoyed because he had not yet received the orientation program outline due on December 4, 1981, and he believed that if Mazzella were truly interested in keeping her job, she should have called him from home to explain why she could not complete the project on time. Tr. at 362. Mazzella contended at trial that she had placed the outline on Silverstein's desk on December 3, but I find this contention highly improbable. Silverstein also had not seen any progress on the employee handbook. Mazzella returned to work on December 9, 1981, but by December 11, 1981, Silverstein still had not received the orientation program outline nor had he seen any progress in any other area. Tr. at 345.

On December 11, Silverstein met with Twitty to discuss the possibility of terminating plaintiff's employment. *Id.* Silverstein informed Twitty that he had been unable to persuade Mazzella to do the kind of job that was necessary for the section to function properly. Tr. at 425. They reviewed Silverstein's previous discussions with Mazzella and his written warnings to her. *Id.* At the conclusion of their December 11 meeting, Twitty advised Silverstein to think about the matter over the weekend, but agreed that, if Silverstein still felt the same way on Monday, he would approve Mazzella's termination. Tr. at 345, 425–26.

Over the weekend, Silverstein thought about whether to terminate Mazzella. Tr. at 346. He concluded that he could not wait any longer for plaintiff to improve her performance because her deficiencies were beginning to reflect negatively on his own performance. *Id.* There is no doubt that Silverstein felt a considerable amount of pressure to please his superiors, especially since his position had not been a step up, but rather a step down on the career ladder.

Silverstein advised Twitty on Monday, December 14, 1981 that he had decided to terminate plaintiff. *Id.* Twitty approved the decision because he believed that Mazzella was not trying to perform her job properly, that she had not responded to previous discussions and warnings, and that she was not likely to do so in the future. Tr. at 429.

Silverstein met with plaintiff on December 14, and briefly reviewed their discussions to date. He informed her that she was discharged effective that day, but would be paid in lieu of notice until the end of the year. Tr. at 346–47. Mazzella then met with Twitty at her request. Tr. at 173, 426. Plaintiff asked if she could be given a job consisting solely of personnel services such as the service awards program, blood and bond drives, suggestion programs, and other items of that nature. Tr. at 427. Twitty responded that he did not believe that these functions added up to a full-time job, and that in any event, he was dissatisfied with the way she had handled those programs. *Id.* Plaintiff then asked if there was any other job she could have, and Twitty indicated that since she was in charge of the job-posting program, she had a better knowledge than he of what jobs were available. *Id.* Neither at that meeting nor at any time thereafter did plaintiff suggest a particular job within the company in which she was interested.

During this meeting Mazzella stated that she believed that she had been terminated because she was pregnant. *Id.* Twitty responded that such a suggestion was ridiculous, that she had been fired for poor

performance, not pregnancy. *Id.* Mazzella asked him whether there was an avenue for her to appeal the termination decision; Twitty responded that President Podmolik had an "open door" policy. Tr. at 426–27.

Plaintiff met with Podmolik on December 17, 1981. Podmolik told Mazzella that she had three options: She could accept her discharge graciously and walk away, she could get a lawyer and sue the company, or she could propose a compensation package for Twitty's consideration. Tr. at 176. Mazzella did not pursue this last option. Tr. at 244.

After reviewing all of the evidence, I find that Mazzella was discharged for poor performance. While Silverstein and Twitty were aware of plaintiff's pregnancy at the time they made the decision to terminate her employment, Mazzella's sex and pregnancy had no bearing on their decision to fire her.

### B. *Relevant Legal Principles*

Mazzella contends that she was discharged in whole or in part because she was pregnant, in violation of title VII of the Civil Rights Act of 1964. As the parties have noted in their briefs, the Supreme Court established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny a three-step approach to the burden of producing evidence in a title VII "disparate treatment" case such as this one. Under *McDonnell Douglas,* the plaintiff bears the initial burden of proving a *prima facie* case of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. To meet this burden, the plaintiff "must ... [offer] evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Once a plaintiff has established a *prima facie* case of unlawful discrimination, the employer must then "articulate some legitimate, nondiscriminatory reason" for the action. *McDonnell Douglas,* 411 U.S. at 802, 93

S.Ct. at 1824. The employer need not prove that its actions were nondiscriminatory; it need only "articulate" a legitimate, nondiscriminatory reason for them. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

Once the employer has advanced a nondiscriminatory reason for its action, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered reason was a mere pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Board of Trustees v. Sweeney,* 439 U.S. at 25, 99 S.Ct. at 295. A plaintiff may demonstrate pretext in one of two ways: (i) by persuading the court that a discriminatory reason more likely motivated the employer than its articulated reason, or (ii) by indirectly showing that the employer's proffered explanation is unworthy of credence. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. While under *McDonnell Douglas* the burden of producing evidence shifts from the plaintiff to the employer and back to the plaintiff, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ In meeting this ultimate burden of persuasion, a title VII plaintiff need not show that an illegal factor was the sole motive for the employer's action. She need only demonstrate that an illegal motive played a significant part in the adverse decision; in other words, she must show that "but for" the illegal factor, she would not have been treated as she was. *See, e.g., McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976). Thus, it is sufficient if that factor was one of many factors, including legitimate ones, that motivated the employer. *See, e.g., Lewis v. University of Pittsburgh,* 725 F.2d 910,

915 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Lincoln v. Board of Regents,* 697 F.2d 928, 938 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *Geller v. Markham,* 635 F.2d 1027, 1035 (2d Cir. 1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); *see generally* Brodin, *The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective,* 82 Colum.L.Rev. 292 (1982).

Where a defendant fails to persuade the trial court to dismiss the action at the close of the plaintiff's case, and responds to the plaintiff's proof by offering evidence of a nondiscriminatory reason for its action, the court need no longer focus on the *McDonnell Douglas* framework. *Aikens,* 460 U.S. at 714–15, 103 S.Ct. at 1481. Instead, the court should proceed to the "ultimate factual inquiry" of every title VII case— whether the defendant intentionally discriminated against the plaintiff. *Id.* at 715, 103 S.Ct. at 1481. In short, once the case has been tried, "the district court must decide which party's explanation of the employer's motivation it believes." *Id.* at 716, 103 S.Ct. at 1482.

■ Accordingly, my obligation is determine whether, as Mazzella contends, she was discharged in whole or in part because she was pregnant, or whether, as Globcom asserts, she was terminated for poor performance. As I stated in my findings of fact above, I have concluded after reviewing all of the relevant evidence that Mazzella was discharged because of her poor performance, and that her sex and pregnancy had no bearing on the decision to terminate her employment.

My reasons for this conclusion are simple. First, the defense rested principally on Silverstein's testimony regarding the history of his dealings with Mazzella, and I found that testimony entirely credible. Second, I found Mazzella's suggested illegal motive improbable. Plaintiff's scenario runs like this: Silverstein, a harried, overworked, and understaffed manager was facing intense pressure from President

Podmolik to step up his unit's performance. Then, just before Silverstein was about to get a third recruiter to take some of this pressure off of the unit, Mazzella announced that she was pregnant. Silverstein knew that Globcom had liberal leave policies and reemployment rights for pregnant workers, and knew that he would have to hold Mazzella's job open for her indefinitely. Faced with the choice of continued understaffing while Mazzella was out on disability leave, or seeking an immediate permanent replacement for her, Silverstein opted for his own career survival. "He swiftly trumped up dubious grounds for [Mazzella's] termination, and within weeks of her pregnancy disclosure, he discharged her." Plaintiff's Post-Trial Brief at 45–46.

This theory fails to take account of several significant factors. For example, it ignores the fact that Silverstein had repeatedly warned Mazzella of the need to improve her work performance before he learned of her pregnancy. Silverstein had a number of informal discussions with plaintiff about this issue beginning in July or August 1981, and he had two formal meetings with her about the issue on November 3 and November 6, 1981. As I noted in my findings of fact above, Silverstein first learned of Mazzella's pregnancy at the end of the November 6 meeting. By that point, he had twiced warned her that if her performance did not improve, he would have no alternative but to terminate her employment.

I cannot credit Mazzella's contention that the first time Silverstein informed her that she might be terminated was in his November 16, 1981 memorandum to her. Plaintiff admitted that the November 16 memorandum summarized the discussion on November 3. Tr. at 237–38. The memorandum explicitly states that it is a reiteration, in writing, of their conversation on November 3 and states that possible termination was discussed before orally. Moreover, in her November 17 memorandum in response, Mazzella did not dispute Silverstein's statement that he had already verbally warned her of the possibility of termination. Had

there been no prior oral warning of termination, plaintiff surely would have pointed that out in her November 17 response in which she painstakingly took issue with virtually every other statement made in Silverstein's November 16 memorandum.

Moreover, Mazzella's theory that Silverstein discharged her in order to avoid continued understaffing is not supported by common sense. First, there is no evidence that if Mazzella went on disability leave Silverstein could not have filled her position with a temporary employee until Mazzella returned. Second, if Silverstein's concern was adequate staffing, and if Mazzella had been performing satisfactorily, Silverstein certainly would have deferred plaintiff's discharge to a more convenient time. As of December 1981, Silverstein knew that Mazzella was in at most the third month of her pregnancy, and accordingly would not expect her to go out on maternity leave for another five to six months. Mazzella had not exhibited any health problems suggesting a need for a medical leave before her anticipated delivery date, nor had she indicated a desire to stop working anytime soon.

Moreover, Silverstein knew that Howard had just transferred to the employment section, that he had no experience in personnel matters, and that he would require substantial training before he could assume the duties of an employment recruiter. Silverstein was also painfully aware that section's workload was heavy, and must have realized that Howard would be of no immediate assistance in easing that workload until he had learned the recruiting process.

In short, plaintiff was terminated at what was probably the worst possible time from the standpoint of easing the section's workload. If, as Mazzella contends, Silverstein was motivated to terminate her out of a concern over understaffing, it would have made no sense for him to do so on December 14. The net result of plaintiff's termination on that date was simply to aggravate the workload situation—instead of two

relatively experienced recruiters, Silverstein was left after plaintiff's discharge with one experienced recruiter and one totally inexperienced recruiter who needed to be trained.

If Mazzella's performance had in fact been satisfactory, Silverstein's only logical course of action consistent with the section's heavy workload would have been to retain plaintiff at least until Howard had learned his new job sufficiently to be able to render some meaningful assistance in coping with the recruiting workload. The timing of plaintiff's discharge is thus consistent only with defendant's articulated reason for her termination: that her performance was so poor that it was counterproductive to retain her even when the workload was heavy.

For all of these reasons, I conclude that Mazzella failed to prove that defendant's articulated reason for terminating her, poor performance, was merely a pretext for discrimination. Plaintiff contends, however, that in attempting to prove a nondiscriminatory reason for firing her, Globcom impermissibly relied on inadmissible hearsay evidence. Mazzella complains that Globcom's defense in this case consisted almost entirely of Silverstein's and Twitty's testimony about complaints they had received from other Globcom employees not called as witnesses at trial.

This contention must be rejected for two reasons. First, Globcom's defense was not based almost exclusively on secondhand reports of poor performance. Silverstein and Twitty related numerous firsthand observations about Mazzella's deficiencies. In any event, it was not impermissible for Silverstein and Twitty to testify about the complaints they received from other Globcom employees. While Mazzella is of course correct in pointing out that a title VII defendant must "clearly set forth, *through the introduction of admissible evidence*, the reasons for plaintiff's [termination]," *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094 (emphasis added), she fails to appreciate that Silverstein's and Twitty's testimony concerning the complaints they received about her work performance were properly admitted at trial as nonhearsay evidence. As I stated repeatedly during the trial, the testimony concerning the complaints was not admitted to prove that the incidents complained of had in fact occurred, but for the purpose of proving that Silverstein and Twitty had received these complaints. The mere receipt of these complaints was relevant and sufficient to show that plaintiff's supervisors had reason to believe that plaintiff was not performing satisfactorily. Moreover, it is well settled that an employer may rely on such testimony in articulating a nondiscriminatory reason for its actions. *See, e.g., Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285, 291 (8th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir.1982); *Sutton v. Atlantic Richfield Co.*, 646 F.2d 407, 410 (9th Cir.1981); *Franklin v. Greenwood Mills Marketing Co.*, 33 Fair Empl.Prac. Cas. (BNA) 1847, 1854 (S.D.N.Y.1983).

Mazzella argues that to permit defendant to rely on such evidence as a legitimate basis for her discharge is "patently unfair." Plaintiff's Post-Trial Brief at 49. She contends that it denies her "the critical opportunity to cross-examine on the ultimate issue," *id.*, which apparently in her view is whether her performance was actually substandard. But a title VII plaintiff cannot prevail simply by demonstrating that she was a good employee, for "[a]n employer may discharge a worker wisely, irrationally, or for no good reason" whatsoever. *Wade v. New York Tel. Co.*, 500 F.Supp. 1170, 1176 (S.D.N.Y.1980). The ultimate issue is the employer's motivation. Plaintiff was not deprived of an opportunity to cross-examine Silverstein and Twitty with respect their motivation for discharging her simply because defendant did not call as witnesses the employees who made the complaints to them. Moreover, if plaintiff wished to examine these employees, she was free to subpoena them for trial.

Mazzella also complains that defendant's justification was not sufficiently "clear and reasonably specific," *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, to give her an adequate opportunity to demonstrate pretext. She argues that most of the incidents defendant relies on to demonstrate poor performance occurred before her disclosure that she was pregnant, and that defendant has not pointed to any specific incidents after her disclosure serious enough to prompt the swift decision to terminate her. In making this argument, however, plaintiff misses entirely defendant's reason for firing her.

Defendant does not claim that it terminated plaintiff because of specific incidents of poor performance between early November and mid December, 1981. Rather, the problem was that Mazzella did nothing to correct previous deficiencies. She did not make progress on the orientation outline or the employee handbook. But most significantly, she did not change her attitude or exhibit a desire or willingness to make the necessary effort to perform her job properly. As I commented during the trial, the point is not that anything affirmative happened between November 3, 1981 and December 14, 1981 to prompt Mazzella's termination, but that *nothing* affirmative happened. Defendant demonstrated in considerable detail that Silverstein and Twitty simply ran out of patience. There is nothing vague about this justification for Mazzella's termination.

Finally, plaintiff contends that defendant's defense was developed "after the fact" and is therefore is obviously pretextual. In support of this argument, Mazzella notes that some of the incidents of poor performance that defendant relied upon at trial were never mentioned in the course of discovery and were cited for the first time at the trial. Mazzella also notes that it is not clear that all of the incidents were known to Silverstein and Twitty prior to her discharge, and therefore they could not have served as part of the motivation for her termination.

I have carefully reviewed the trial record, defendant's answers to plaintiff's pretrial interrogatories, and the transcripts of Silverstein's and Twitty's pretrial depositions. Plaintiff is correct that a small number of the incidents defendant relied on at trial were not specifically mentioned or detailed in pretrial discovery. This is unfortunate, and litigants should always make as full and complete a disclosure as possible. But it is clear to me that the vast majority of the incidents defendant relied on at trial were disclosed during discovery. Indeed, the consistencies in the pretrial and trial records are far more striking than the inconsistencies.

I cannot accept plaintiff's suggestion that defendant's failure to disclose every incident Silverstein and Twitty relied on in deciding to terminate her proves that their justification is merely a post hoc fabrication. First of all, the incidents that were not specifically disclosed were not particularly noteworthy, and defendant had little to gain by fabricating their existence or intentionally withholding their disclosure. Second, I note that defendants did disclose certain incidents in discovery that they did not raise at trial. This, too, undermines plaintiff's suggestion that defendant simply made up its articulated reason for the termination or intentionally withheld information. Finally, given the large number of incidents in question, it is not surprising that a small number were overlooked in preparing interrogatory answers and in answering deposition questions.

In addition, plaintiff is correct that the record is unclear in one or two instances as to whether Silverstein or Twitty were aware of an incident of poor performance. If they were not aware of these incidents, they clearly could not have relied on them in deciding to terminate Mazzella. However, there can be no doubt that Silverstein and Twitty were aware of a great number of incidents and complaints, and even if I were to give plaintiff the benefit of every doubt in this regard, it would not change my conclusion that Silverstein and Twitty decided to discharge her for poor performance, and not because she was a woman or

because she was pregnant. In sum, I conclude that Mazzella has failed to prove by a preponderance of the credible evidence that she was discharged in violation of title VII.

## II. *The Terms of Plaintiff's Discharge*

In addition to her contention that Globcom discharged her because she was pregnant, Mazzella argues that the terms and conditions of her severance were discriminatory. She contends that similarly situated male employees with performance problems equal to or greater than hers were treated considerably better than she was. In particular, she contends that Larry Howard, who became the second recruiter in the section upon her discharge, had substantial performance problems, but he was not discharged. She also contends that other male employees at Globcom were given a longer warning period in which to improve their performance. She contends that when male employees did not improve, they were demoted with no reduction in salary rather than summarily terminated. Finally, she alleges that when deficient male employees were finally confronted with discharge or severance, they were permitted to resign, retire early, obtain pre-disability or disability leave, accept the company's redundancy allowance, or obtain a generous severance package. She alleges that Globcom provided male employees with letters of recommendation and offered them help in securing new employment.

In connection with this claim of disparate treatment, I make the following additional findings of fact:

### A. *Findings of Fact*

Globcom had no fixed policy with respect to how much time employees would be given to improve their performance once they had been warned of termination. Tr. at 454. Typically, however, employees in such circumstances were given one month to better their performance. *Id.* As noted previously, Mazzella was first warned of possible termination on November 3, 1981 and she was terminated on December 14, 1981.

Globcom also had no fixed policy with respect to whether an employee would be demoted or transferred rather than terminated. Twitty did not demote or transfer Mazzella because in view of her poor work effort and attitude he could not recommend her for any other position in the company. Tr. at 458. Twitty's decision not to demote or transfer Mazzella rather than to terminate her was not based on Mazzella's sex or pregnancy.

Globcom also had no set policy concerning the terms and conditions of an employee's severance. As noted above, Silverstein met with plaintiff on December 14, 1981 and briefly reviewed their discussions to date. He then informed her that she was discharged effective that day, but would be paid until the end of the year in lieu of notice. Mazzella met with Twitty that same day and with Podmolik on December 17, 1981. She did not request at any of these meetings a demotion or transfer to another existing position, or the opportunity to resign. Tr. at 168, 173–74, 244, 409, 426–28. She did not request a letter of reference, use of Globcom office space to search for another job, additional severance pay, or assistance in finding another job. Tr. at 173–74, 352, 426–28.

As noted previously, Mazzella did ask Twitty that she be given a job composed solely of various personnel services such as the service awards program, blood and bond drives, suggestion programs and other items of that nature. Tr. at 427. Twitty declined to give plaintiff such a position because he did not believe that these functions added up to a full-time job, and that in any event, he was dissatisfied with the way she had handled those programs in the past. *Id.* Twitty's decision was not based on Mazzella's sex or pregnancy. Moreover, I find Globcom never had a position such as the one Mazzella requested. While Patricia Salter assumed most of the personnel services functions after Mazzella's discharge, she was also responsible for Globcom's attendance program. This program was not part of personnel services, and

occupied approximately half of Salter's work time. Tr. at 350.

Mazzella attempts to compare herself to Larry Howard, a male employee who also suffered performance problems, but who was not terminated. Silverstein ultimately became dissatisfied with Howard's performance approximately two years after Howard transferred to the employment section. Tr. at 387; *see* PX 43A. Howard would become overwhelmed when given a large number of assignments at the same time, he had difficulty staying organized, and as a result, he sometimes missed deadlines. Tr. at 387–88; PX 25 at 213–16, 220–23. Silverstein did not discharge, threaten to terminate, or demote Howard at any time. Tr. at 387; PX 25 at 214. Howard eventually initiated and obtained a transfer into the marketing department. Tr. at 35–36, 48–49, 388.

Although Silverstein perceived both Mazzella and Howard as having performance problems, the two employees were not similarly situated. A crucial difference between them is that Howard tried very hard to perform his assigned duties, whereas plaintiff did not. In Silverstein's words, Howard made a "herculean effort" to do his job, but was unable to do so. PX 25 at 213. Mazzella, on the other hand, did not perform properly because she exerted insufficient effort. Thus, plaintiff and Howard had performance deficiencies that differed in cause, in nature, and in the extent to which they could be remedied by further effort on their respective parts. Silverstein's decision to terminate Mazzella, but not to terminate Howard was not based on sex or Mazzella's pregnancy.

In addition to comparing herself to Howard, Mazzella has attempted to compare herself with the 28 other male employees discussed in PX 46. Mazzella contends that all of these male employees had "performance problems," but that Globcom treated them better than it treated her. She alleges, for example, that some of these employees were demoted or transferred rather than terminated, and that those male employees who were terminated were given more generous severance terms than she was. However, I find that Mazzella has failed to demonstrate that she was similarly situated with any of these male employees.

First, plaintiff presented no evidence that any of these employees held positions comparable to hers, or that they were subject to the same standards governing performance evaluation and discipline. Apart from three former Vice Presidents of Industrial Relations, none of these employees even worked in the IR department. Second, plaintiff failed to demonstrate that these employees engaged in conduct similar to hers. Indeed, there is evidence that many of these employees were demoted, transferred, or terminated for reasons unrelated to the performance of their work duties. Moreover, while there is some evidence that some of these employees presented "performance problems," there is little evidence of the nature of their performance deficiencies. What evidence there is suggests that these employees were charged with conduct not at all similar to Mazzella's. In short, I find that plaintiff has failed to make any meaningful comparison between herself and the male employees named in PX 46. After reviewing all of the relevant evidence, I find that the terms and conditions of Mazzella's discharge were not discriminatory.

### B. *Relevant Legal Principles*

As noted above in my findings of fact, Globcom had no set policy with respect to whether an employee should be demoted or transferred rather than terminated, and no set policy concerning the terms and conditions of an employee's severance upon termination. Accordingly, Mazzella has attempted to demonstrate that the company discriminated against her on the basis of her sex and pregnancy by looking to the company's treatment of male employees.

However, for evidence relating to other employees to be relevant, those employees must be situated similarly to plaintiff. *See Liberman v. Gant,* 630 F.2d 60, 68 (2d Cir.1980); *Worthy v. United States*

*Steel Corp.*, 616 F.2d 698, 702–03 (3d Cir. 1980); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.) (per curiam), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980). Employees are not "similarly situated" merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it. *See Talley v. United States Postal Serv.*, 33 Fair Empl.Prac. Cas. (BNA) 233, 238 (E.D.Mo.1982), *aff'd*, 720 F.2d 505 (8th Cir.1983), *cert. denied*, 446 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984). For the reasons stated in my findings of fact above, I conclude that Mazzella was not similarly situated with Larry Howard or the other male employees with whom she compared herself. In addition, I note that Mazzella never asked for the demotion or transfer or severance terms she now complains she was denied. Plaintiff cannot complain that she should have been offered alternatives she never requested.

### III. *Pregnancy Disclosure Requirement*

Mazzella's third contention is that Globcom's policy relating to disability and disability leaves is a per se violation of title VII in that it imposes more stringent disclosure requirements for female employees who are pregnant than it does for other employees who expect to become disabled at a predictable future date. Plaintiff contends that Globcom's policy "mandates immediate disclosure of a pregnancy regardless of whether the employee may desire pre-disability leave," whereas "all other anticipated disabilities need not be disclosed unless the employee desires to take a pre-disability leave." Plaintiff's Post-Trial Brief at 56, 57.

In connection with this claim, I make the following additional findings of fact:

### A. *Findings of Fact*

Globcom's policy with respect to disability and disability leaves is set forth in a written memorandum dated May 16, 1979 from Charles Twitty, Vice President of Industrial Relations, to all Globcom employees. PX 7. It states in relevant part:

Effective April 29, 1979, employee fringe benefit programs were required to be in compliance with the Pregnancy Discrimination Act. Accordingly, the Company's policy for leaves associated with disability has been revised and Illness Benefits (sick pay) practices have been changed for disabilities due to pregnancy, childbirth, or related medical conditions.

A new type of leave, called the "Pre-Disability Leave," is established for the convenience of employees to permit them to cease work before they actually become disabled and unable to work. For example, an employee who becomes pregnant may wish a leave before the onset of disability. Similarly, a man or woman who requires serious surgery at some date in the future may want to take time off in advance of the surgery. On presentation of a physician's certification of a pregnancy or other known future disability and the expected date of delivery, surgery, or other disabling event, an employee may be granted a Pre-Disability Leave.

. . . .

If you are a female employee and become pregnant, please inform us as soon as you know. Either male or female, if you expect to become disabled at a predictable future date and may wish Pre-Disability Leave, please inform us. This is for work force planning purposes, and if you wish to take Pre-Disability Leave it permits necessary actions to be started. If you become disabled, immediate notification is necessary. Only by promptly advising us can you receive the benefits to which you are entitled.

PX 7.

This memorandum does not *require* a pregnant female employee to advise Glob-

com as soon as she learns of her pregnancy. The memorandum merely *asks* that an employee, male or female, who expects to become disabled at a predictable future time, for whatever reason, to advise Globcom of that fact for work force planning purposes. This is true whether the employee may wish a pre-disability leave or not.

In support of this finding, I note that the express purpose of the memorandum is to announce that Globcom was changing its disability leave policies in order to comply with the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (1982). Since the purpose of that statute was to eliminate distinctions based on pregnancy, it is highly unlikely that Globcom was implementing a policy that required pregnant employees to make disclosures not required of other employees who would become disabled at a predictable time in the future. Indeed, the second paragraph of the memorandum makes clear that Globcom intended to treat a pregnant employee in the same way it treated any employee who expected to become disabled at a definite point in the future.

Moreover, I find credible Twitty's testimony that the memorandum was intended merely as a request that employees, both male and female, give their supervisors advance notice of predictable future disabilities, solely for work force planning purposes. Tr. at 418–19. Twitty's interpretation of the memorandum, given his familiarity with its origin and purpose, and the fact that it bore his signature, is entitled to considerable weight.

I find further support for my conclusion that the memorandum does not require a pregnant employee to disclose her pregnancy immediately in the fact that no disciplinary action has ever been taken against any pregnant employee who failed to give advance notice of her predicted date of disability. Tr. at 419. Indeed, Globcom does not monitor whether any employee did or did not give advance notice of a predictable disability. *Id.* Nor were any forms ever created for employees to use give such notice. *Id.*

As noted previously, on October 29, 1981, Mazzella learned that she was pregnant. She immediately filed an insurance claim with the benefits section of the IR department. PX 45. Mazzella did not file this claim in order to comply with the company's request that employees who anticipated becoming disabled in the future advise the company. In support of this finding I note that the insurance claim was a confidential document, it was not addressed to plaintiff's supervisor, and it contained no information concerning her anticipated future date of disability.

As noted previously, Mazzella told Silverstein that she was pregnant on November 6, 1981. I find that plaintiff did not make this disclosure in order to comply with the company's request that employees who expect to become disabled advise the company. Mazzella did not advise Silverstein of her expected date of delivery.

Mazzella's filing of the insurance claim had no effect on her employment. It was the policy of the benefits section to keep medical claims, including those relating to pregnancy, confidential. Tr. at 23–24. They were not disclosed to an employee's manager. Tr. at 24. As noted previously, Mazzella's disclosure to Silverstein on November 6, 1981 that she was pregnant had no impact on her employment. Silverstein and Twitty decided to terminate plaintiff for poor performance, and not on the basis of her sex or pregnancy.

B. *Relevant Legal Principles*

■ Title VII prohibits employers from treating pregnant employees differently than other employees with predictable future disabilities. With the adoption of the Pregnancy Discrimination Act, title VII was amended to provide, in relevant part: "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k) (1982). If an employer adopts a

policy that on its face distinguishes between pregnant and other kinds of employees, it is guilty of a per se title VII violation, and can avoid liability only by demonstrating that the policy did not adversely affect the plaintiff. *See Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir.1982).

■ Mazzella's claim that Globcom's pre-disability leave policy constitutes a per se violation is without merit. As I noted in my findings of fact above, the company's policy does not require pregnant employees to disclose their pregnancies. It merely requests that they do so in order to assist the company in work force planning. There is no penalty if a woman fails to disclose her pregnancy and later takes a pre-disability or disability leave. Moreover, Globcom's policy makes no request of pregnant employees that it does not also make of all employees, male or female, who anticipate being disabled at some predictable point in the future.

[8] Finally, even if Globcom's policy does treat pregnant employees differently than other employees who expect to be disabled, the policy had no effect on Mazzella's employment. Plaintiff's disclosure to the benefits section that she was pregnant was confidential, and Silverstein did not learn of plaintiff's pregnancy until she herself told him. Moreover, Silverstein terminated plaintiff's employment with the company for poor performance, not because she was pregnant. Accordingly, I conclude that Mazzella has failed to prove that Globcom's pre-disability policy violated title VII.

## IV. *Equal Pay Act Claim*

Mazzella's fourth claim is that Globcom wilfully violated the Equal Pay Act by paying Larry Howard, the second recruiter in the employment section upon Mazzella's discharge, a higher salary than it paid her. She contends that she and Howard were expected to perform the same job, but Globcom paid her $7,000 per year less than it paid Howard. Plaintiff argues that the only reasonable explanation for this difference is that Globcom paid Howard more because he is a man and she is a woman.

In connection with this claim, I make the following additional findings of fact:

### A. *Findings of Fact*

As of the date of her discharge, Mazzella's annual salary was $21,300. PX 38. Howard's annual salary in December 1981 was $28,300. *Id.*

Howard joined the employment section of the IR department in November 1981. Tr. at 382. Upon plaintiff's discharge, he assumed some, but not all, of the duties Mazzella had performed. As noted previously, Mazzella was responsible for recruiting new employees for marketing, engineering, operations, union, Globcom Systems, Inc., and international services positions. In addition, she was responsible for ordering employee service awards, helping to organize the 25–year award dinner, approving employee "family store" purchases, organizing the annual savings bond drive, logging employment requisitions, running the job-posting program, and developing an employee orientation program and employee handbook. Mazzella was expected to spend 90 percent of her time on her recruiting responsibilities.

In the recruitment area, Howard assumed partial or complete responsibility for recruiting employees for marketing, union, Globcom Systems, Inc., and international services positions. Tr. at 382–83; PX 24 at 24. Those recruiting duties Howard did not assume were transferred to Nancy Charles. *Id.* Of Mazzella's other duties, Howard assumed responsibility for ordering service awards and approving family store purchases. *Id.* The balance of Mazzella's nonrecruiting duties were transferred to Patricia Salter. *Id.*

Howard assumed some duties plaintiff had not performed, such as the Targeted

Selection Program, the Urban Summer Intern program, the Minorities in Engineering program, and the Staff Auditor Intern program. Tr. at 48, 59–60; *see* DX UU. Nonetheless, like Mazzella, Howard was expected to devote the bulk of his work efforts to recruiting. Tr. at 57. Thus, despite the fact that Mazzella had some responsibilities that Howard did not, and vice versa, I find that the two positions were essentially the same. In support of this finding I note that Silverstein, as the section's supervisor, was in the best position to make a comparative assessment of the two positions, and he stated at his pretrial deposition that the position Howard assumed was "substantially the same as" the position Mazzella had held. PX 25 at 85.

Howard entered the IR department in September 1977. Prior to that date, Howard was employed by Globcom as a computer console operator. Tr. at 41. As a computer operator, he was a union-represented employee and his pay scale was determined by a collective bargaining agreement. *Id.* His base salary prior to entering the IR department was approximately $16,500. *Id.* In addition, as a union employee, he was eligible to receive overtime pay, and earned approximately $10,000 per year in overtime on top of his base salary. Tr. at 42. His total annual compensation before entering the IR department was therefore approximately $26,000. *Id.; see* DX II.

Effective September 1, 1977, Howard transferred from the union-represented position of computer console operator to the non-union position of Industrial Relations Associate in the IR department. DX HH. Dominick Zurlo, Manager of Compensation and Benefits, was involved in determining Howard's salary upon his transfer. Tr. at 480. Zurlo testified that three principal factors were taken into account in setting Howard's entry-level salary in the IR department. First, Howard had been earning substantial overtime pay, and although it was not anticipated that he would have to

work overtime hours in his new position, it was unlikely that he could be enticed to join the IR department if he had to take a substantial cut in pay to do so. Tr. at 480. Second, Howard had almost 20 years of service with the company. Finally, he had extensive experience with various types of communications equipment and understood the technical aspects of the company's business. Tr. at 481; *see* DX HH, DX UU. Zurlo believed that Howard's background and skills would be valuable in the position to which he was transferred. Tr. at 481. I find Zurlo's testimony on these issues credible.

Upon consideration of all of these factors, Howard's salary upon entering the IR department in 1977 was set at $20,000 per year. This salary was not based on sex in any way. After entering the department, Howard received annual merit increases every year thereafter on a percentage basis keyed to his base salary, as did the other members of the department. Tr. at 44; *see* DX MM. These annual merit increases were not based on sex in any way. Howard's salary upon transfer to the employment section in November 1981 was product of his entry-level salary plus annual merit increases thereafter.

As noted previously, Mazzella transferred to the IR department in March 1976. Her entry-level salary was $13,300. PX 2. None of the factors giving rise to Howard's entry-level salary of $20,000 were applicable to Mazzella. Prior to her transfer, she had been in a non-union position with a salary of $13,300. She would not have had to take a cut in pay to assume her new position in the IR department. She had at that time only five years of service with Globcom, and she had no training, educational background, or prior experience in personnel work. As previously noted, Mazzella received annual salary increases each year she was in the IR department.

The difference between Mazzella's salary and Howard's salary in December 1981 was the result of the factors discussed above,

and was not based directly or indirectly on sex.

## B. *Relevant Legal Principles*

The Equal Pay Act prohibits employers from paying higher wages to men than to women for the performance of "equal work, ... except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1) (1982). In order to establish a *prima facie* case of an Equal Pay Act violation, a female plaintiff must demonstrate that (i) she was compensated at a lower rate than a male employed in the same establishment (ii) for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). If the plaintiff establishes a *prima facie* case, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the wage differential is justified under one of the Equal Pay Act's four exceptions. *Id.* 417 U.S. at 196–97, 94 S.Ct. at 2229. Any of the four exceptions, if established, is a complete defense to conduct that would otherwise violate the statute. 29 U.S.C. § 206(d)(1) (1982).

In proving that she and higher paid men are performing "equal work," a plaintiff need not demonstrate that her job is identical to a higher paid male employee's job, only that the two kinds of work are "substantially equal." *Usery v. Columbia Univ.,* 568 F.2d 953, 958 (2d Cir. 1977); *Koster v. Chase Manhattan Bank, N.A.,* 609 F.Supp. 1191, 1193 (S.D.N.Y. 1985). The determination of substantial equality must be based on actual job content, not job titles or descriptions. *Marshall v. Building Maintenance Corp.,* 587 F.2d 567, 571 (2d Cir.1978) (per curiam); *Rossini v. Ogilvy & Mather, Inc.,* 597 F.Supp. 1120, 1154 (S.D.N.Y.1984). It is not sufficient for a plaintiff to show that the two jobs are "comparable," but courts should not engage in "overly nice distinctions in job content," lest employers evade the statute at will. *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282, 285 (4th Cir.1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).

In light of these principles, I conclude that the job Mazzella had from May 1981 through December 1981 was substantially equal to the job Howard assumed in December 1981. Of course, as I indicated in my findings of fact above, the two positions were not identical, but for the reasons stated in my findings of fact, I conclude that the positions were essentially the same. Defendant places great emphasis on the fact that Mazzella and Howard had a different "mix" of responsibilities, but it is clear to me that the similarities of the two jobs significantly outweigh the differences.

Accordingly, the burden of proof shifted to Globcom to demonstrate that the difference between Mazzella's salary and Howard's salary is justified under one of the Equal Pay Act's four exceptions. Defendant does not contend that the differential was the result of one of the first three exceptions—a seniority system, a merit system, or a productivity measurement system. Rather, it argues that the difference is the result of another factor not based on sex. I agree.

As noted in my findings of fact above, Howard's higher salary was the product of a higher entry-level salary and subsequent merit raises. His relatively high starting salary was based on three factors unrelated to sex. First, Globcom could not induce him to accept a transfer from his previous position to a job in the IR department without approximating the high income he was earning as a result of his overtime pay. Second, Howard had 20 years of experience with the company, and third, he had certain skills and experience

that the company believed would be useful in his new position. None of these factors was itself directly or indirectly based on sex.

A wage differential attributable to such factors clearly meets the requirements of the Equal Pay Act's exception for a differential "based on any other factor other than sex." *See, e.g., Horner v. Mary Inst.,* 613 F.2d 706, 714 (8th Cir.1980) (where a higher salary was paid to a male employee because his "experience and ability made him the best person available for the job and because a higher salary was necessary to hire him," the salary was based on a factor other than sex); *Walter v. KFGO Radio,* 518 F.Supp. 1309, 1318 (D.N.D.1981) (education, experience, and marketplace value of an individual's skills are relevant factors in determining an employee's starting salary, and if a higher salary is necessary to hire the best person to do the job, that consideration is a valid "factor other than sex"). Accordingly, I conclude that defendant has established a complete defense to plaintiff's Equal Pay Act claim.

*Conclusion*

For the foregoing reasons, I conclude that plaintiff has failed to establish any of her claims by a preponderance of the credible evidence. Accordingly, her complaint is hereby dismissed and the Clerk of the Court is directed to enter judgment in favor of defendant RCA Global Communications, Inc.

SO ORDERED.