Adamantia POLLIS, Plaintiff,

v.

The NEW SCHOOL FOR SOCIAL
RESEARCH, Defendant.

No. 93 Civ. 3328 (CSH).

United States District Court,
S.D. New York.

Jan. 2, 1996.

Order on Reconsideration Jan. 3, 1996.

Janice Goodman, New York, NY, for Adamantia Pollis.

Michael T. McGrath, Putney, Twombly, Hall & Hirson, New York, NY, for the New School for Social Research.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

In this action, the plaintiff is a former member of the faculty of an institution of learning. She alleges that both prior to her resignation from the faculty and subsequent to it, the institution discriminated against her in manners prohibited by Federal statutes. At trial, plaintiff proposes to prove discrimination by, *inter alia*, comparing her circumstances with those of other faculty members. This method of proof gives rise to the question of the identity of those other individuals with whom it is probative to compare plaintiff: what has come to be known in such cases as "the universe." Two universes must be delineated in this case: one relating to plaintiff's pre-resignation discrimination claims, and the other to her post-resignation claim. The parties raise issues *in limine* with respect to the proper boundaries of both universes. This opinion resolves those issues.

### Background

Adamantia Pollis, a former, tenured full-professor on the graduate faculty of the New School for Social Research (hereinafter the "New School" or "defendant") originally brought several claims against the New School alleging age and sex discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq., Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000(e), et seq., the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) et seq., and Section 296 of the New York State Human Rights Law. This original complaint was filed on May 14, 1993.

This action has been the subject of two prior opinions. The first of these opinions, issued on July 21, 1993, denied plaintiff's request for a preliminary injunction, and granted defendant's request for summary judgment dismissing plaintiff's ADEA claim. The second opinion, dated September 18, 1995, denied defendant's motion for summary judgment as to the remaining claims. Familiarity with these opinions is assumed.

Presently, plaintiff maintains three causes of action. The first of these, a Title VII claim; arises out of Pollis's forced retirement at age 70. From 1968 to 1994, the by-laws of the New School provided that all full-time faculty members must retire at age 70.[1] Several professors have, however, been granted exceptions to this requirement, and allowed to continue teaching either as full professors or in a more limited capacity. Pollis claims that the New School discriminated against her on the basis of gender in offering her a limited, post-age 70 position, namely, that of a part-time adjunct professor.

---

1. The Board of Trustees of the New School issued a Statement on Retirement in 1988, in response to a change in applicable law. In my opinion dated September 18, 1995, I held that this statement would not affect the parameters of the appropriate universe. Thus, for the purposes of the present motion, this statement is irrelevant.

Her second and third claims arise under Title VII and the EPA, and allege that prior to her retirement, Pollis was paid a salary lower than that of comparable male professors, solely on account of her gender.

This action is now trial-ready, and jury selection is scheduled to begin on January 8, 1996. Pursuant to a court order, the parties have submitted *in limine* papers which address various evidentiary concerns, among them the appropriate universe of professors to whom plaintiff will compare herself at trial. This opinion resolves the latter issue by delineating two separate universes, one for Pollis's post-age 70 discrimination claim and one for her equal pay claims. An opinion resolving the other evidentiary disputes will be filed separately.

*Standards for Admissibility Under the Federal Rules of Evidence*

"Relevant evidence" is defined in the Federal Rules of Evidence as:

> [E]vidence having any tendency to make the existence of any fact this is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401. Evidence that is not relevant is inadmissible, Fed.R.Evid. 402, as is relevant evidence the probative value of which is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

*Post–Age 70 Discrimination Claim*

At trial, plaintiff seeks to demonstrate that the New School discriminated against her on the basis of sex in offering her a limited, post-age 70 position by comparing offers given to her and similarly situated females at age 70 to those extended to similarly situated male professors. The general admissibility of such comparative evidence is well-established, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (statistics as to an em-

ployer's employment policy and practice "may be helpful to a determination of whether" its treatment of a particular employee "conformed to a general pattern of discrimination."); *Fisher v. Vassar College*, 66 F.3d 379, 394 (2nd Cir.1995) (rejecting proposition that "comparative proof ... is inadmissible in a Title VII case"), and the New School does not dispute its admissibility in this particular case. It does however, dispute the appropriate "universe" for comparison, i.e. those professors who are similarly situated to plaintiff such that a comparison between the men and women in the group is relevant and not misleading. *See Lieberman v. Gant*, 630 F.2d 60, 68 (2nd Cir.1980) (for comparisons to other employees to be relevant, those employees must be similarly situated). It is particularly important in this regard for the court to ensure that all professors in the universe occupied positions similar to Pollis's prior to retiring, and were offered post-retirement positions in a comparable context. And from the opposite perspective, the universe for consideration must not be gerrymandered so as to exclude certain professors who are so situated from the universe. *See Fisher*, 66 F.3d at 402 (reversing district court's finding of discrimination in part because plaintiff's case was "built on gerrymandered data and a series of statistical fallacies."). If the universe were not so defined, the relevance of any comparison would be suspect, and could tend to confuse the jury rather than enlighten it.

In her reply brief, plaintiff summarizes her proposed universe in the following terms:

> All tenured professors employed by the New School for Social Research graduate faculty any time on or after January 1, 1974 up to December 31, 1979.

To understand the precise nature of plaintiff's request, it is necessary to look beyond this statement, to the discussion in her original and reply briefs. This discussion makes clear that plaintiff's proposed universe consists of all tenured professors employed[2] by the New School graduate faculty at some point between 1974 and 1979 who, like Pollis,

---

**2.** The Court understands Pollis's use of the word "employed" in this context to mean professors who were on the faculty at any time during this period, without regard to when they were first employed. In other words, "employed" does not mean "hired."

continued in their tenured position until age 70 and after reaching that age, sought to continue teaching. This group consists of eight professors, six of whom are men and two of whom are women. According to the plaintiff, the evidence at trial will demonstrate that the men in this group retained more favorable positions upon reaching age 70 than the women.

Defendant argues for a universe consisting of all tenured, graduate school professors who retired and were offered post-retirement employment between 1982 and the date Pollis retired, June 30, 1993. Alternatively, defendant argues that the start date for the universe should be 1968.

Two basic evidentiary issues emerge from these two contentions: (1) whether, as defendant says, the universe should include professors who retired at any age and sought post-retirement appointments, or, as plaintiff says, only those professors who continued in their tenured positions to 70, and sought teaching appointments upon reaching this age; and (2) the relevant starting and ending dates for the comparative universe. I will resolve these issues in turn, but first must consider an issue not in dispute.

█ Pollis and the New School agree that the relevant universe should only include tenured, graduate school professors. Despite this agreement, I must conduct an independent inquiry into whether this constitutes an arbitrary gerrymander of the sort decried in *Fisher v. Vassar College, supra,* a recent Second Circuit opinion that considers the use of statistics in a discrimination suit. The plaintiff in that case claimed, *inter alia,* that Vassar, in denying her tenure, had discriminated against her on the basis of her status as a married woman. *See Fisher* at 385. To bolster this claim, plaintiff introduced statistics tending to show that no married, female professor in the "hard" sciences at Vassar had been granted tenure during a 30–year period.[3] *See id.* at 401. The district court credited these statistics, and ultimately upheld her claim of discrimination on the basis of gender in conjunction with marital status.

*See id.* at 401–2. The Second Circuit reversed, in part because it found that Fisher's "statistical case [was] built on gerrymandered data and a series of statistical fallacies." *Id.* at 402. In discussing one such gerrymander, the court held that "it was an abuse of discretion for the district court to fail to consider ... university wide statistics. The court's decision to base its analysis solely on the statistics related to the 'hard sciences' was error." *Id.* at 404.

In the case at bar, the determination of both Pollis and the New School to include only graduate professors in the comparative universe is not an arbitrary gerrymander. As both parties note, only the graduate faculty at the New School grants tenure. Mandatory retirement provisions such as the one in the New School's by-laws are only relevant with respect to professors holding tenured positions, since professors employed at will can, absent discrimination, be fired without justification. Pollis's post-age 70 discrimination claim directly involves the New School's application of its mandatory retirement policy, and therefore only professors subject to that policy—tenured, graduate school professors—should be included in the comparative universe.

█ This last conclusion brings me to the first of the two issues delineated above: whether the universe should include all professors who were granted post-retirement employment at any time, or only those who continued in a tenured position to age 70, and sought post-retirement employment upon reaching that age. To resolve this dispute, it is necessary to understand the nature of plaintiff's claim.

Plaintiff alleges that she was granted only a partial, and thus to her unsatisfactory, exemption from the mandatory retirement policy on account of her sex. Her claim, then, is not simply that that the post-retirement offer extended to her was discriminatory; rather, it is that the mandatory retirement policy was applied to her in a discriminatory way. Thus, this policy is the

---

**3.** Fisher defined "hard" sciences to include: mathematics, physics, chemistry, geology, biolo-

gy, and computer science. *See Fisher* at 401.

vehicle through which the New School carried out its alleged discriminatory motives, and the post-retirement offer is an incident to that alleged discrimination.

Viewed in this light, Pollis's claim reveals the relevant universe for comparison. Only those professors who were subject to the mandatory retirement policy and sought an exemption from it were similarly situated to Pollis. Professors who sought early retirement were different from her in two fundamental ways. First, they wanted reduced responsibility. Most likely, any post-retirement position offered to them would reflect this desire, and be more akin to the limited position offered to Pollis. Second, those who chose to retire early had bargaining power that Pollis lacked: the New School could not revoke their tenure *without their consent*. Therefore, even if they retained a post-retirement position superior to the one offered to Pollis, this could simply be attributable to their more favorable bargaining position.

Pollis should *only* be compared to professors who, like her, came face to face with the mandatory retirement policy at age 70. Including professors who retired voluntarily at an earlier age could mislead the jury by skewing the result of any comparison one way or the other.

■ Defendant's misdirected focus on retirement rather than reaching the age of 70 leads it to raise a different, equally unconvincing contention with respect to the relevant universe. This contention pertains to three male graduate school professors who were granted complete exemptions from the mandatory retirement policy and continued to teach as tenured, full professors until well after their 70th birthday. Defendant argues that only the post-retirement appointments of these professors should be considered, not their positions upon attaining the age of 70. Thus, as defendant would have it, if a professor, upon reaching the age of 70, was granted a complete exemption from the mandatory retirement policy and allowed to continue in a tenured position of full professorship, this fact should not be considered by the jury in determining the validity of plaintiff's claim. Merely stating the proposition reveals its fatal flaw. As noted above, the gravamen of plaintiff's claim is that, upon turning 70, she was forced to retire and was offered an unsatisfactory post-retirement position because of her gender. Evidence tending to show that 70-year old male professors were granted complete exemptions from the mandatory retirement policy would therefore be highly relevant. Accordingly, I find that the *post-age 70 positions* of these professors, not merely their *post-retirement positions*, are appropriate subjects for comparison.

■ I now turn to the appropriate start and end dates for the comparative universe. As an initial matter, I reject the way in which plaintiff selected her outer parameters. Plaintiff focuses on the period between 1974 and 1979, and seeks to include only those professors who worked for the New School at some point within that six-year span. However, whether a professor worked between these years is not relevant to whether he or she was similarly situated to Pollis when offered post-age 70 employment. Rather, as the discussion above makes clear, what is relevant is the time frame in which that professor reached the age of 70. That is, the universe should only include those professors who received a post-age 70 teaching appointment at a time when the policy applied to Pollis was in force.

At first glance, this inquiry would yield a start date of 1968 and an end date of 1994. These are the dates in which the mandatory retirement policy was in effect. However, plaintiff and defendant have raised arguments that call into question the propriety of these temporal boundaries. I now consider these arguments.

Defendant urges this Court to adopt a start date of 1982. Defendant assigns significance to this date because President Fanton—the President of the New School when Pollis retired—was recruited and hired in September of that year, "specifically to 'turn around' the graduate faculty." Memorandum of Law in Support of Defendant's Motion in Limine at 10. From this, defendant concludes that the New School's application of its retirement policy changed markedly in 1982, rendering any comparison to appointments prior to that date misleading.

I do not question President Fanton's importance to the graduate faculty. However, defendant has not pointed to any evidence which establishes that Fanton changed how the mandatory retirement policy was applied, or that he even had the power to do so. In addition, it is unclear what role Fanton and prior presidents played in determining whether a particular professor would be granted an exemption from the mandatory retirement policy. Without evidence that demonstrates tangible presidential involvement in mandatory retirement decisions, I am unwilling to hold that only those professors who reached the age of 70 during the Fanton administration are relevant for the purposes of comparison.

*Mazzella v. RCA Global Communications,* 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd* 814 F.2d 653 (2nd Cir.1987), a case cited by defendant in support of its argument, does not in any way undermine my conclusion. There, plaintiff claimed, *inter alia,* that the terms and conditions of her severance were discriminatory, and sought to establish this claim by introducing evidence demonstrating the company's more favorable treatment of male employees. *See Mazzella,* 642 F.Supp. at 1545. The district court found that these male employees were not similarly situated to plaintiff, and therefore, disregarded this evidence. *See id.* at 1545–47. Specifically, the court said:

> [I]n order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards of performance evaluation and discipline, and must have engaged in conduct similar to plaintiff's....

*Id.* at 1547. Defendant interprets this language broadly to apply to the facts of the present case. However, the district court in *Mazzella* was referring to the kind of supervisor that closely monitors employees' work on a day-to-day basis. Mazzella could not properly compare herself to certain male employees because any difference in treatment might simply have been attributable to

the fact that they were evaluated and disciplined by different direct overseers. In the present case, it cannot reasonably be asserted that the relationship between the New School's president and tenured faculty members is akin to that between a low level corporate employee and his or her immediate supervisor. Presumably, the New School's president supervises the work of tenured professors only on the most exalted level. Therefore, *Mazzella* does not support a conclusion that evidence pertaining to professors who reached the age of 70 prior to Fanton's appointment in 1982 is irrelevant and misleading.[4]

I now turn to plaintiff's proposed time restrictions on the universe. As I have noted above, in proposing certain time parameters, Pollis has focused on when professors were employed, rather than when they reached the age of 70. This, of course, is irrelevant to whether these professors were similarly situated to Pollis when they were offered postage 70 employment. However, in proposing her start date of 1974, plaintiff has raised a fairness concern that must be addressed.

Plaintiff asks that I exclude from the universe professors who left the New School prior to 1974. She claims that documents pertaining to these professors were not discoverable, and therefore the jury should not be permitted to consider their treatment under the New School's mandatory retirement policy.

Plaintiff is correct in asserting that she was precluded from discovering documents pertaining to faculty members whose employment by the New School terminated prior to 1974. Soon after the case commenced, plaintiff requested, among other things, certain documents pertaining to all tenured professors employed by the New School since 1966. Information in these documents was to include, *inter alia,* each professor's: name, sex, age, date of hire, faculty rank at date of hire, department appointed to, date tenure granted, degrees received, student evaluations, peer reviews, number of courses taught per year, and assignments other than teaching.

---

4. It is also worth noting that the district court in *Mazzella* was considering the sufficiency, not the admissibility, of plaintiff's evidence.

The New School refused to produce many of the documents requested, asserting that discovery prior to 1990 was inappropriate because any claim arising from events prior to that date was time-barred. Magistrate Judge Bernikow ordered the New School to comply with plaintiff's request. Subsequently, the parties entered into a stipulation, whereby the New School waived its right to appeal Magistrate Judge Bernikow's order, and plaintiff agreed to limit her discovery requests to tenured professors employed between 1974 and 1988. According to plaintiff, the compromise date of 1974 was chosen because that was the year in which plaintiff filed an earlier charge alleging equal pay violations with the EEOC.[5] That charge was ultimately dismissed by the New York City Commission on Human Rights, and therefore, events that occurred prior to the filing of that charge were considered by the parties to be irrelevant to this litigation.

The New School contends that the stipulation was only intended to foreclose discovery of documents relating to matters of compensation. Whatever the purpose of the stipulation, its language sweeps broader than that. Read in conjunction with Judge Bernikow's order, the stipulation precludes discovery of documents that contain general information pertaining to professors who were only employed by New School prior to 1974. This information is certainly relevant to Pollis's post-age 70 discrimination claim. If professors who were only members of the graduate faculty prior to 1974 were included in the universe, and certain of them received more favorable post-age 70 appointments than Pollis, Pollis would have to rebut arguments by the defendant that these professors were more deserving of such appointments than her. She could not do this without the information above. I am therefore satisfied that her request to exclude all "pre–1974" professors reflects a genuine concern for trial fairness, rather than an attempt to inappropriately gerrymander the universe. Accordingly, I grant her request.[6]

The language of the stipulation also has an effect on what the ending date of the comparative universe should be. The stipulation limited plaintiff's document request to those tenured professors who were employed by the New School prior to 1988. Presumably, then, plaintiff does not have general information pertaining to professors hired after this date. Therefore, if any professor hired after 1988 remained on the graduate faculty until the age of 70, and reached that age between 1988 and 1994, that professor should be excluded from the universe.[7]

To summarize the discussion above, the appropriate comparative universe for the post-age 70 discrimination claim is:

> All tenured, graduate school professors who were employed by the New School at some point between 1974 and 1988, reached the age of 70 before 1994, and, like Pollis, sought to continue teaching beyond that age.

Having so defined the universe, I must now address a separate concern that derives from language in the *Fisher* opinion critiquing the district court's reliance on a small statistical sample. The court stated:

> Given the small size of the "hard" sciences sample ... it is questionable whether any statistics limited to the "hard" sciences carries any persuasive weight as a matter of law.

*Fisher* at 404. I am not sure at this point exactly how many professors will comprise the universe in this case. Certainly, it contains at least eight, the number of professors in plaintiff's more narrow proposed universe. Assuming this to be the size of the sample, I do not consider it troublesome at the admissibility stage. In *Fisher*, the question for the circuit court was whether a reasonable factfinder could rely on the results of a suspect

---

5. The parties do not explain how the compromise date of 1988 was chosen.

6. In so doing, I assume that the stipulation has in actuality limited discovery according to its terms. If plaintiff has in fact received documents precluded by the stipulation, I would require to her to include in the universe professors whose relevant information is contained in those documents.

7. Arguments made by plaintiff in favor of a 1979 end date pertain only to the appropriate universe for the equal pay claims, *see infra* pp. ——–——, and therefore, I do not consider them here.

statistical study. Here the issue is whether a particular comparative sample should be admissible evidence at trial. The question, then, is whether the results of any comparison would have probative value.

█ Pollis seeks to demonstrate that each of the males in this group received more favorable post-age 70 offers than each of the women. If this is true, and the disparity between the offers is large, that is certainly relevant to Pollis's sex discrimination claim. Of course, it may not necessarily lead to the conclusion that Pollis was a victim of discrimination. Nor may it be sufficient to convince a reasonable factfinder of discriminatory animus, if other justifications exist to explain the differential. But the small size of the sample alone does not render it irrelevant. *See Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 872 (2nd Cir.1992) ("[s]imply because the actual number of female probationers that were fired was small, does not necessarily mean that those statistics lacked probative force."). Therefore, I will allow plaintiff to compare the post-age 70 positions offered to male and female professors in the universe delineated above.

*Equal Pay Claims for Pre–Retirement Years*

Pollis seeks to introduce statistics in support of her equal pay causes of action which she claims demonstrate a disparity between the salaries of male and female professors on the New School's graduate faculty staff. Defendant argues that plaintiff's statistics should be excluded as irrelevant. Under its view, plaintiff can only introduce evidence tending to show that specific male "comparators" were paid more than Pollis. Alternatively, defendant asserts that the parameters of plaintiff's statistical universe are not properly defined. Before proceeding to these arguments, it is useful to identify the elements of wage discrimination causes of action under the EPA and Title VII. Only then can I identify what evidence is relevant to Pollis's equal pay claims.

█ In the amended complaint, Pollis alleges that she was denied "the same salary as men who perform substantially the same duties." Amended Complaint at ¶ 35. A claim of unequal pay for equal work can arise under both the EPA and Title VII. In analyzing the elements of any such claim, section 206(d) of the EPA provides a useful starting point. It provides in pertinent part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). To state a prima facie case under this section, "a plaintiff must demonstrate that: i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2nd Cir. 1995) (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974)). To show this, "plaintiff need not demonstrate that her job is identical to the higher paid position, but only must show that the two positions are 'substantially equal.'" *Id.* (quoting *Lambert v. Genesee Hospital,* 10 F.3d 46, 56 (2nd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994)). Once plaintiff has established her prima facie case, the burden of persuasion shifts to the defendant to establish that one of the four affirmative defenses listed in the statute justifies the disparity. *See Tomka,* 66 F.3d at 1310; *Aldrich v. Randolph Cent. School Dist.,* 963 F.2d 520, 526 (2nd Cir.1992), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992).

█ Plaintiff also asserts an equal pay claim under Title VII. "[A] claim of unequal pay for equal work under Title VII ... is

generally analyzed under the same standards used in an EPA claim." *Tomka* at 1312. *See also Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 446 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 ("[B]oth acts should be read in **pari materia,** and neither should be interpreted in a manner that would undermine the other."). Title VII explicitly incorporates the four exceptions of the EPA, so that the employer vindicated under the EPA cannot be held liable under Title VII. *See* 42 U.S.C. § 2000e–2(h); *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1136 (5th Cir.1983). However, if a plaintiff chooses to sue under Title VII on a theory of intentional discrimination, that plaintiff does not need to demonstrate that members of the opposite sex were paid more for performing equal work, but must produce evidence "that [his or her] wages were depressed because of intentional sex discrimination." *County of Washington v. Gunther*, 452 U.S. 161, 165–66, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981). *See also Tomka* at 1313; *Aldrich*, 963 F.2d at 528.

■ A plaintiff may of course proceed under Title VII by establishing that members of the opposite sex were paid more than he or she for performing substantially the same duties. *See Tomka* at 1312; *Plemer*, 713 F.2d at 1134 (paying male and female employees unequal salaries for equal work is a violation of Title VII in "the classic sense."). The elements of such a cause of action mirror those of an EPA section 206 claim. The only difference between the two causes of action has to do with burden-shifting. Under Title VII, the defendant only bears the burden of articulating a non-discriminatory justification for a salary disparity, with the burden of persuasion then shifting to the plaintiff to show that this articulated reason is pretextual. *See McDonnell Douglas v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). A defendant sued under the EPA, on the other hand, bears both the burden of production and persuasion in establishing the applicability of an affirmative defense. *See Tomka* at 1310; *Aldrich* at 526.

As noted above, Pollis's equal pay claims track the language of EPA section 206. The complaint contains no separate allegations that would constitute a wage discrimination claim under Title VII alone. Thus, since Pollis's two equal pay claims are premised on the same theory of liability—namely, unequal pay for equal work—the ensuing analysis applies equally to both of them.

■ Pollis seeks to support her equal pay claims by presenting statistical evidence tending to show that tenured, male graduate school professors who worked for the New School at some point between 1974 and 1979 had a higher average salary than Pollis and other tenured, female graduate school professors employed during these years.

As an initial matter, defendant has argued that I exclude these statistics, and limit plaintiff's evidentiary material to specific "comparators," i.e. specific professors who allegedly received higher pay for equal work. I decline to entirely exclude plaintiff's statistical data, and will admit it for the limited purpose of demonstrating that any defense raised by New School is pretextual.

■ With respect to causes of action alleging unequal pay for equal work, it is doubtful whether statistics tending to demonstrate a difference between the average salaries paid to male and female employees can satisfy plaintiff's prima facie burden. *See Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1135–36 (5th Cir.1983) (it is questionable whether statistics can make out a prima facie Title VII or EPA violation if plaintiff's evidence is otherwise insufficient). An EPA or Title VII plaintiff cannot make out a prima facie case simply by "compar[ing] herself to a hypothetical male with a composite average of a group's skill, effort and responsibility." *Houck v. Virginia Polytechnic Institute*, 10 F.3d 204, 206 (4th Cir.1993). Rather, as the language of *Tomka* makes clear, to carry this initial burden, the plaintiff must show that specific male employees who received a higher salary than her performed substantially equal work on jobs requiring substantially equal skill, effort and responsibility. *See, e.g., Fisher*, 66 F.3d at 411 (plaintiff compared her salary to the salaries of professors whose positions she claimed were substantially equal to hers); *Tomka*, 66 F.3d at

1310–11 (employee of a corporation presented the same analysis). Once Pollis has introduced evidence tending to show that certain male professors are "equal" to her in this sense, I will allow her to average their salaries, and compare this figure to her own salary.[8] *Cf. Hein v. Oregon College of Educ.*, 718 F.2d 910 (9th Cir.1983) ("[T]he proper test for establishing a prima facie case in a professional setting is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale."). However, in establishing her prima facie case, Pollis cannot rely on statistics which simply demonstrate that all male professors who worked between certain years were paid more than she.

■ This does not mean, however, that general statistical data of the sort Pollis seeks to introduce is entirely irrelevant in a suit alleging sex-based wage discrimination. Once the plaintiff has satisfied its initial prima facie burden, and the defendant introduces evidence purporting to justify the pay differential, the plaintiff can use statistical data to demonstrate that the defendant's purported justification for the differential is, in reality, mere pretext. *See McDonnell Douglas*, 411 U.S. at 804–5, 93 S.Ct. at 1825–6; *Plemer* at 1137. If, through the use of her statistical data, Pollis can establish that the New School maintained a discriminatory wage policy toward women, the jury could reasonably conclude that the New School's justification for Pollis's salary is pretextual. *See Plemer* at 1137. However, Pollis cannot submit this statistical evidence in support of her prima facie case, since it does not purport to include only those professors who perform substantially similar jobs with the level of skill, effort and responsibility that Pollis performed hers. Accordingly, I admit plaintiff's statistical data for the limited purpose of demonstrating pretext.

■ Having decided that plaintiff's statistical data is admissible for this limited purpose, I must now address whether plaintiff's proposed statistical universe is gerrymandered so as to yield artificial results that support her equal pay claims. If this is the case, I must eliminate the gerrymander. Otherwise, the statistics derived from the universe could potentially mislead the jury.

Plaintiff seeks to exclude all salary data of professors employed by New School prior to 1974 from her statistical universe. Consistent with her previous argument, plaintiff contends that an earlier start date would prejudice her case at trial, since salary information for professors who terminated their employment prior to 1974 was not discoverable. I find that the stipulation did in fact preclude plaintiff from receiving this information, and agree that a start date earlier than 1974 is inappropriate.[9]

The New School does not dispute the inappropriateness of an earlier start date, and in fact concedes that the stipulation applies to matters concerning compensation. *See* Reply Affidavit in Support of Defendant's Motion for Summary Judgment by Michael McGrath at ¶ 6. It does however request that the start date be pushed forward to 1990, or alternatively, to 1976. For reasons that follow, I deny both requests.

---

8. There is some debate in the parties' papers as to whether the plaintiff can calculate damages by subtracting Pollis's salary from the average salary of those professors in her statistical study. To avoid any future confusion, I will clarify this matter here. Plaintiff's potential recovery is limited to the salary she would have been received had she been a male professor performing a substantially equal job. Thus, Pollis must only use the salaries of these professors in computing her damages. She cannot simply average the salaries of male professors "across the board" and use this figure as her damages benchmark. I am, on the other hand, reluctant to allow plaintiff to identify one equally situated professor, and use that professor's salary to compute her damages. Such an approach would allow Pollis to artificially inflate damages by selecting the highest paid, equally situated professor. Therefore, I follow the approach of Ninth Circuit in *Hein v. Oregon College of Educ.*, 718 F.2d 910 (1983) and will instruct the jury to compute damages by averaging the salaries of all equally situated male professors. *See id.* at 917.

9. This conclusion is subject to the same qualification as my conclusion to limit the universe for the post-age 70 discrimination claim to the years 1974 through 1988. *See supra* note 6.

Defendant's argument in favor of a 1990 start date stems from a statute of limitations issue originally raised in its motion for summary judgment. Defendant had argued that Pollis could not recover damages for events occurring prior to May 14, 1990, because claims arising from those events are time-barred under the three-year statute of limitations applicable to willful violations of the EPA. Here, defendant renews this claim, and bases its argument for a 1990 start date on its view that claims prior to this date are time-barred.

Plaintiff resists defendant's motion for summary judgment as to her pre–1990 claims by arguing that they are part of a continuing violation. This argument raises two issues for consideration: (1) Does the "continuing violation" exception to certain statutes of limitations apply in the context of EPA claims?; and (2) If so, has plaintiff raised genuine factual issues as to whether a continuing violation exists in the present case? For reasons that follow, I answer both questions in the affirmative. Accordingly, I deny defendant's renewed motion for partial summary judgment[10] and request for a 1990 start date.

■ Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991), (citing *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted).

Claims arising under the EPA are subject to a two-year statute of limitations. However, if the plaintiff alleges a willful violation, the applicable statute of limitations is three years. *See* 29 U.S.C. § 255(a). Both parties seem to agree that Pollis's claim sufficiently alleges a willful violation, and is therefore subject to section 255's three-year statute of limitations.

■ As a general rule, "Under the [EPA], a separate claim accrues each time the aggrieved employee receives a paycheck reflecting discriminatory wages." *Erickson v. New York Law School,* 585 F.Supp. 209, 213 (S.D.N.Y.1984). *See also Lacey v. Carroll McEntee & McGinley, Inc.,* 1994 WL 592158, 3 (S.D.N.Y.1994); *Soler v. G & U, Inc.,* 86 F.R.D. 524, 528 (S.D.N.Y.1980); *Franklin v. New York Law Publishing Company,* 1995 WL 408390, 1 (S.D.N.Y.1995) (discussing application of section 255 in the context of claims accruing under the Fair Labor Standards Act). This means that a plaintiff who alleges a willful violation of the EPA can generally only recover damages for discriminatory wages paid within three years of the filing of the complaint. *See Erickson,* 585 F.Supp. at 213.

■ The Second Circuit has, however, developed a continuing violation exception in the context of Title VII claims, that would seem to apply equally to claims arising under the EPA. A Title VII plaintiff must file a charge with the EEOC within 180 days of the violation, or, where the plaintiff first files with a state or local agency, within 300 days of the violation. *See* 42 U.S.C. § 2000e–5(e). However, under the "continuous violation" tolling doctrine, "[a] continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy." *Acha v. Beame,* 570 F.2d 57, 65 (2d Cir.1978) (emphasis in original). "[W]here an illegal policy is so maintained, relief for injuries sustained even before the beginning of the limitations period is appropriate." *Id.* Thus, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in fur-

---

10. Although defendant has not explicitly said so, its statute of limitations argument would seem to apply with equal force to Pollis's Title VII equal pay claim. Assuming this to be the case, my ultimate conclusion that Pollis has raised a mate- rial factual issue as to whether the New School has maintained a discriminatory wage policy leads me to deny partial summary judgment on that claim as well.

therance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert*, 10 F.3d at 53. *See also Gomes v. Avco Corp.*, 964 F.2d 1330 (2d. Cir.1992) ("the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.") (quoting *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir.1985), *cert. denied* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)).

 Plaintiff argues, in effect, that the continuous violation doctrine applied to Title VII claims in *Acha* and *Lambert* applies equally to claims under the EPA. I agree. In *Acha*, the Second Circuit framed the doctrine in general terms, and did not limit it to claims arising under Title VII. Rather, the court referred to "a continuously maintained illegal employment policy" in defining the proper scope of the doctrine, language which would seem to apply to salary policies that violate the EPA as well as Title VII. My view that the language of *Acha* expands beyond the facts of that case is supported by the Second Circuit's recent decision in *Cornwell v. Robinson*, 23 F.3d 694 (2d Cir.1994), in which the court of appeals cited *Acha* and applied the "continuous violation" doctrine in the context of a § 1983 discrimination claim. *See Cornwell*, 23 F.3d at 703–4.

Even setting aside the general language of *Acha*, I see no relevant distinction between Title VII and the EPA that would serve to justify applying the "continuous violation" doctrine to one but not the other. As noted above, a plaintiff who has established a prima facie violation of the EPA has also established a prima facie violation of Title VII. That plaintiff might also demonstrate a violation of Title VII by presenting evidence of discriminatory animus on the part of the employer. But the fact that Title VII provides a broader cause of action than the EPA has no bearing on the proper scope and applicability of the "continuing violation" doctrine.

In addition, there is no policy justification for this doctrine that would apply only in the context of Title VII. I can discern two such policy rationales. The first stems from the "equitable notion that the statute of limitations ought not to run until facts supportive of that cause of action are or reasonably should be apparent to a reasonably prudent person similarly situated to plaintiff." *Franklin v. New York Law Publishing Company*, 1995 WL 408390, 3 (S.D.N.Y.1995) (quoting *Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir.1993)). Just as in the case of a discriminatory policy under Title VII, a plaintiff who is the victim of an employer's discriminatory pay policy may not discover this discrimination until years after her wage was set. The "continuous violation" doctrine also reflects an understanding that claims of discrimination stemming from an illegal employment policy are not stale as long as that policy is in effect. *See Egelston v. State University College at Geneseo*, 535 F.2d 752, 755 (2d Cir.1976). This justification also applies with equal force to discriminatory policies that violate the EPA.

Few courts in this circuit have directly answered whether the "continuous violation" doctrine applies to causes of action arising under the EPA. A few courts have stated the general rule discussed above, *see supra* pp. 786–787, and held that an EPA plaintiff's recovery is limited to discriminatory wages paid within the applicable limitations period. *See Erickson*, 585 F.Supp. at 213–14; *Soler*, 86 F.R.D. at 528. The New School cites these cases in support of its view. However, in both cases, the court did not consider the issue that has been raised here: whether the "continuous violation" doctrine applies in the context of the EPA. Therefore, their reiteration of the general rule does not persuade me to rule in defendant's favor.

I have found only one decision from this district that addresses the present issue, and it does so only implicitly. In *Lacey v. Carroll McEntee & McGinley, Inc.*, *supra*, the plaintiff brought causes of action for wage discrimination under both Title VII and the EPA in December of 1993. The court held that the plaintiff could not recover for wages paid prior to December, 1991. *See id.* at 4. In so holding, the court found that the plaintiff had failed to allege a continuing violation, *see id.*, implicitly assuming that the continu-

ing violation doctrine applies equally to claims arising under the EPA and Title VII. Other circuits have more directly affirmed the applicability of the "continuing violation" doctrine in the context of the EPA. *See, e.g., Miller v. Beneficial Management Corp.*, 977 F.2d 834, 843–44, 848 (3rd Cir.1992).

There is however, one decision from this district that demands discussion. In *Franklin v. New York Law Publishing Co., supra,* the plaintiff brought claims under section 7 of the Fair Labor Standards Act ("FLSA") on July 11, 1995, alleging that her employer willfully failed to pay her overtime in accordance with that provision. *See id.* at 1. The court refused to allow recovery of overtime pay withheld prior to July 11, 1992, *see id.,* and specifically held that the "continuing violation" doctrine does not apply to FLSA claims. *See id.* at 2. The court relied in part on the fact that the application of the exception to FLSA would be inconsistent with one of its purposes: to allow plaintiffs to recover on claims that could not have been discovered earlier. The court said:

> [I]n the present case, defendant's violation of plaintiff's rights were not of a kind that would have become clear only in retrospect, when several different events were viewed in conjunction by the plaintiff; rather, each deficient paycheck immediately put the plaintiff on notice that, for the particular pay period involved, she had not been paid all that she had earned.

*Id.* at 3.

I have no quarrel with this analysis with respect to FSLA claims for overtime pay. There is no occasion for such a plaintiff to contemplate a claim "only in retrospect," or in relation to payments to other employees. The FLSA plaintiff has put in the time. The employer's payment for that time either conforms to the statute or it does not. The employee is immediately aware, at least constructively, of any insufficiency. But the EPA plaintiff is in a quite different situation. The EPA plaintiff's paycheck does not pro-

claim its statutory insufficiency upon its face. The EPA plaintiff must take the additional step of contrasting his or her wage to wages paid to members of the other sex. I do not think the court in *Franklin* intended the quoted rationale to apply to EPA as well as FSLA overtime claims. If it did, I respectfully disagree.[11]

■ Having therefore found that the "continuing violation" exception applies to EPA claims, I must now address whether summary judgment on this issue is appropriate. Specifically, I must decide if there is a genuine issue of material fact as to whether the New School maintained a policy of paying men and women different salaries for equal work. I find that triable issues of material fact exist on this question.

The Second Circuit has recently defined what comprises a "continuing violation":

> [A] continuing violation may be found where there is proof of ongoing discriminatory polices [sic] or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.

*Cornwell,* 23 F.3d at 704. An appendix attached to defendant's brief in support of its motion for summary judgment demonstrates that a material fact exists in this regard. This appendix ranks the salaries of all tenured, graduate school professors for each year between 1976 and 1993. These charts make clear that no woman professor has been ranked among the top three in salary in any given year. Only five female professors in this 17–year span has ever been paid a salary that ranks in the top ten, and only three can boast about ever being among the top five. Whether these somewhat crude statistics evince a policy of wage discrimination is not clear. However, they do raise a genuine issue of triable fact on this question, and therefore, I deny defendant's motion for

---

11. The New School claims that Pollis was aware of any possible discrimination in 1974, when she filed her first wage discrimination charge. This may or may not be so. But it is in either event irrelevant to Pollis's right to recovery if she can prove that at least one act of salary discrimina-

tion occurred within the limitations period, and that such act was part of a continuously maintained illegal employment policy. *See* cases cited *supra* pp. ——–——. Whether Pollis can prove a continuing violation of this nature is an issue for trial.

partial summary judgment. Since the validity of the New School's argument for a 1990 start date depends on this conclusion, I reject it as well.

The New School argues alternatively for a start date of 1976. In support of this date, the New School points out that plaintiff's 1974 wage discrimination claim was formally dismissed in 1976. I fail to see the connection between this fact and the appropriate start date for the universe. Whatever effect this dismissal might have had on plaintiff's present claims, it did somehow render irrelevant salary data from 1974 to 1976. Therefore, I reject defendant's proposed start date of 1976.

Pollis seeks to exclude the salary data of all professors hired after 1979 from her statistical analysis. Her stated reason for this exclusion is somewhat counterintuitive. She claims that salary disparities between these professors and Pollis are greater than those found in her proposed universe, but that defendant has a legitimate non-discriminatory reason for the disparity, namely, a different pay schedule for professors hired after 1979.

The New School, apparently disavowing the argument that Pollis puts in its mouth, says "[t]here is absolutely no evidence that there were two salary pools, or that one standard was applicable to one group of professors and another to the other group." Letter Brief dated December 15, 1995 at 6.

If defendant is correct in that assertion, then professors, male and female, who were hired after 1979 must certainly be included in the EPA claim universe. There are apparently 19 of them. Together with faculty members hired during earlier years, these professors hired after 1979 were competing with Pollis for shares in the limited funds available for faculty compensation. The issue, however, is not whether greater disparities in salary existed between Pollis and post–1979 hires; rather, it is whether statistically significant disparities existed between salaries paid to men and women during the years for which Pollis makes claim as a victim of a discriminatory policy. Prima facie, post–1979 hires must be included in the universe to avoid the gerrymandering condemned by the Second Circuit in *Fisher.*

The only basis for excluding post–1979 hires from the universe would be a change in defendant's salary structure so fundamental—a shifting of the institution's economic tectonic plates so palpable—that professors hired after 1979 are not in positions sufficiently equivalent to Pollis and faculty members hired before 1979. Pollis makes that claim in her Reply *in limine* Brief at 4; but the claim is cast in purely conclusory terms, with no reference to evidence developed during discovery or otherwise.

The existence *vel non* of a salary structure change of this magnitude determines the propriety of including the post–1979 faculty hires in an EPA statistical analysis, as the New School wishes to do, or excluding them, as Pollis wishes to do. If whatever changes were made in the post–1979 salary structure nevertheless left all faculty members in positions of substantial equivalence with respect to the manner in which their compensation was calculated, the post–1979 hires must be included in the statistics. If pre–1979 hires and post–1979 hires cannot be fairly compared with each other in that regard, the post–1979 hires cannot be included.

Since post–1979 hires are prima facie includable, the burden falls upon plaintiff to demonstrate circumstances that would require their exclusion. My present intention is to treat the issue as one falling within Rule 104(a) and (b), Fed.R.Evid., and in case of need conduct a hearing in the absence of the jury. As a preliminary step, however, counsel for plaintiff is directed to file and serve a detailed offer of proof, specifying the witnesses, substance of testimony, and the exhibits upon which she relies in support of the conclusory claims advanced in her reply brief. That submission is to be made on or before the close of business on January 3, 1996. In making that direction, I express no present view on whether such proof is allowable in the light of prior scheduling, discovery, and pre-trial orders made in the case.

Plaintiff has alternatively argued that all professors hired after 1988 be excluded, again raising fairness concerns arising out of restrictions placed on the scope of discovery.

Just as documents pertaining to professors who retired prior to 1974 were not available to plaintiff, neither were documents relating to professors hired after 1988. Accordingly, I will not require plaintiff to consider the salaries of professors hired after 1988 in her statistical universe.

To summarize, unless plaintiff is able to demonstrate a basis for excluding post–1979 hires, the appropriate statistical universe for her equal pay claims is:

> All tenured graduate faculty members employed by the New School at some point between 1974 and 1988.

In compiling her statistical data, then, Pollis must consider the salaries of each professor in this universe, for each year that they were employed as a member of the New School graduate faculty. So that no mistake be made, I stress once again that this data is not admissible to establish plaintiff's prima facie case. To carry this initial burden, plaintiff must demonstrate that the salaries of specific male professors occupying substantially equal positions and similarly situated in terms of skill, effort and responsibility were higher than her own.

■ A few issues remain concerning how Pollis presents her statistical data. Pollis proposes a chart which lists the salaries of professors in each successive year, together with the date each professor was hired, granted tenure, and if applicable, granted full professorship. Defendant seeks to exclude these dates from the chart, since they alone do not determine a particular professor's salary. Assuming this to be true, I nevertheless refuse to exclude this information. Surely, it cannot be argued that these dates have no bearing on a professor's salary, and are irrelevant. Defendant, then, must be arguing that Pollis's chart will mislead the jury by implying that salary determinations are made only on the basis of seniority. The jury, however, is quite capable of understanding that other more subjective factors play a role in the New School's salary determinations, and defendant is free to challenge plaintiff's statistical data on this basis. Therefore, I do not agree that plaintiff's inclusion of these dates creates a danger of confusion and unfair prejudice. *Cf. Fisher,*

66 F.3d at 411 (acknowledging the relevance of seniority to claims under the EPA). To the contrary, I am confident that a chart without these dates would confuse the jury. Without them, the jury would have no objective basis upon which to compare the salaries of male and female professors in any given year.

■ The New School has also asked that I require plaintiff to include on her chart the percentage increase in salary given to each professor in the universe from year to year, as well as the average percentage increase given to all such professors in the same academic year. I decline to do so. These figures are arguably irrelevant, since plaintiff must only show that she and other women were paid less in an absolute sense than male professors. They also may be misleading, since the average salary increase of woman professors earning low salaries will tend to be larger in percentage terms than the average salary increase of male professors with higher base salaries.

■ Finally, defendant asks me to preclude Pollis from offering the personnel files of the professors in the statistical universe as a trial exhibit. However, the New School does not argue that all or portions of these files are irrelevant; rather, it only points to the voluminous nature of the exhibit in support of its request. This alone is not a sound factual or legal basis for excluding evidence at trial. Therefore, I will allow plaintiff to introduce the personnel files as a trial exhibit. Defendant can of course raise any relevance objections to portions of the exhibit at trial.

For the foregoing reasons, the relevant universes in the case at bar are defined as provided in this opinion.

It is SO ORDERED.

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

On December 28, 1995, I filed an opinion that delineated the proper statistical universes for Pollis's sex discrimination claims. At that time, I reserved judgment on various other issues raised in the parties' *in limine*

papers. Familiarity with that opinion is presumed.

Both Pollis and the New School have submitted letters asking that I reconsider portions of my December 28, 1995 opinion. I now write to address issues raised in those letters and resolve evidentiary disputes stemming from the parties' previous *in limine* submissions.

*Reconsideration of December 28, 1995 opinion*

In my opinion of December 28, 1995, I identified the proper statistical universe for Pollis's post-age 70 discrimination claim as follows:

> All tenured, graduate school professors who were employed by the New School at some point between 1974 and 1988, reached the age of 70 before 1994, and, like Pollis, sought to continue teaching beyond that age.

Op. at 782. Likewise, I delineated the appropriate statistical universe for Pollis's equal pay claims in the following terms:

> All tenured graduate faculty members employed by the New School at some point between 1974 and 1988.

Op. at 790. The New School questions the propriety of the 1974 start date for the universe pertaining to the post-age 70 discrimination claim, and the 1988 end date for both universes. For reasons explained below, I adhere to my original ruling setting a start date of 1974 for the former universe, but alter my decision to limit both universes to those professors employed by the New School prior to 1988.

As my previous opinion makes clear, the 1974 and 1988 dates were chosen because a stipulation limited discovery to tenured professors employed by the New School between those years. I noted that Pollis's case would be unfairly prejudiced were she forced to consider professors whose background information was unavailable to her during discovery. In the course of this analysis, I added a footnote which stated that if Pollis had received documents precluded by the stipulation, professors whose relevant information is contained in those documents should be included in the universe. *See* Op. at 782 n. 6.

In its letter of December 29, 1995, the New School informed the Court that professors hired after 1988 have been the subject of discovery. In fact, as the New School explains, the stipulation included the 1988 date because documents pertaining to post–1988 hires had been supplied prior to the signing of that stipulation. Pollis does not dispute the New School's factual assertions in this regard. Given that Pollis received information pertaining to post–1988 hires, excluding those professors from the universe is no longer necessary to preserve trial fairness. That being said, I must now determine what the appropriate ending date for each statistical universe should be.

The New School contends that the ending date for the two universes should be 1994, and presumably chooses that date because an amendment to the Age Discrimination in Employment Act automatically repealed the New School's mandatory retirement policy as of December 31, 1993. *See Pollis v. New School for Social Research,* 829 F.Supp. 584, 586 (S.D.N.Y.1993).

I find this argument persuasive with respect to Pollis's post-age 70 discrimination claim. Those professors who reached the age of 70 in the same context as Pollis—in other words, those professors who "came face to face with the mandatory retirement policy at age 70," Op. at 780—should comprise the universe for this cause of action. The policy applied to Pollis remained in effect until December 31, 1993 and therefore all professors who reached the age of 70 between 1974 and that date should be included in the statistical universe. Professors who turned 70 before that date were similarly situated to Pollis, regardless of whether they reached that age prior to Pollis's forced retirement in June of 1993.

The date on which the mandatory retirement policy was repealed does not have any significance in the context of Pollis's equal pay claims. Rather, what is relevant for these claims is when Pollis was forced to retire. By introducing statistical data purporting to demonstrate a pay disparity between male and female members of the New School graduate faculty, Pollis hopes to show

that a discriminatory wage policy was in effect during her tenure there. Were she to establish that such a policy existed, that showing might convince the jury that the New School's proffered justification for Pollis's own salary is pretextual. However, whether such a policy remained in effect after her forced retirement has no bearing on the validity of her equal pay claims. That policy could have been retracted the day after Pollis retired, and it would not make her any less a victim of sex discrimination. Therefore, with respect to her equal pay causes of action, the appropriate ending date for the statistical universe is June of 1993, the month in which the New School ceased paying Pollis as a tenured member of the graduate faculty.

The New School also asks that I reconsider the appropriateness of the 1974 start date for the universe pertaining to the post-age 70 discrimination claim. In pressing the Court to adopt a start date of 1968, the New School revives a flawed argument. In its view, the stipulation only limited discovery on matters of compensation, and therefore, it should not be invoked to truncate the universe for the post-age 70 discrimination claim.

I rejected this argument in my opinion of December 28, 1995, and the advent of the New Year has not changed my view of the matter. As I noted in that opinion, the stipulation precludes discovery of documents that contain general information pertaining to tenured professors who were only employed by the New School prior to 1974. *See* Op. at 782. Without having had access to such information, Pollis cannot be expected to rebut arguments by the defendant concerning the relative worth of pre–1974 professors. Therefore, I decline to change my prior holding setting a start date of 1974.[1]

Finally, the New School requests that I clarify language in my previous opinion discussing the applicable statute of limitations for Pollis's equal pay claims. In that section of the opinion, I noted that claims seeking

redress for willful violations of the Equal Pay Act are subject to a three-year statute of limitations. The New School seeks to ensure that the issue of willfulness is one for trial, and that the jury will ultimately determine the size of Pollis's potential recovery. Nothing in my prior opinion was meant to imply that Pollis had already sustained her burden on the issue of willfulness. At trial, the New School may dispute whether its treatment of Pollis constituted a willful violation of the EPA; indeed, it may dispute whether that treatment constituted a violation of the statute at all.

*Evidence That No Female Professors Were Offered the Alvin Johnson Chair or a Distinguished Service Professorship*

▬ The New School claims that plaintiff should be precluded from introducing evidence tending to show that no female professor was ever offered the Alvin Johnson Chair or a Distinguished Service Professorship. Specifically, the New School questions the relevance of this evidence.

I agree with the New School as to the Alvin Johnson Chair evidence. However, evidence pertaining to Distinguished Service Professorship appointments is relevant to Pollis's post-age 70 discrimination claim. As the New School admits, appointees to this professorship are exempt from the mandatory retirement policy. Apparently, two men received that designation. Evidence showing that no women were offered this professorship could lead to the inference that they were discriminatorily denied an opportunity to bypass mandatory retirement in this way.

*Evidence demonstrating a disparity in the hiring and promotion of female and male tenured professors*

▬ Defendant also questions the relevance of evidence pertaining to the New School's hiring and promotion decisions. Although I do not see how the New School's hiring decisions are pertinent to Pollis's

---

1. In her letter of December 29, 1995, Pollis has asked the Court to clarify whether footnote 6 of my prior opinion mandates inclusion of pre–1974 professors whose information she received after the close of discovery. Those professors should not be considered part of the statistical universe.

Once discovery was complete, Pollis no longer had the ability to depose these professors or inquire further into their qualifications. Therefore, they were not truly subjects of discovery, despite defendant's unilateral disclosures.

three claims, its promotion decisions are certainly relevant to her equal pay causes of action. A professor's salary depends at least in part on his or her title (e.g. full versus associate professor), and therefore, the New School could possibly keep female professors' salaries down by refusing to promote them. Accordingly, in an effort to show that defendant's asserted justifications for specific pay differentials are pretextual, the plaintiff may introduce evidence tending to show that women were promoted at a slower pace than men.

*Salaries of Deans and Administrative Officers*

■ The New School requests that I exclude as irrelevant all evidence pertaining to the salaries of deans and administrative officers. I agree that this evidence is irrelevant to Pollis's equal pay claims. Any disparity between her salary and the salaries of these people would have no probative value, since professors and administrative officers are not similarly situated.

Pollis claims that this evidence is relevant because certain professors on the New School graduate faculty were formerly deans. I simply do not understand how this fact makes their salaries as deans relevant. Therefore, I exclude all evidence concerning the salaries of deans and administrative officers.

*"Demonstrably False" Assertions in Plaintiff's Pre–Trial Order*

■ Defendant asks that certain factual assertions made by plaintiff in her proposed pre-trial order ("PTO") be stricken because they are, in the New School's view, "demonstrably false." Specifically defendant refers the Court to the following factual "mistakes": the classification of certain professors as "Distinguished Service Professors" when in fact they were only "Distinguished Professors"; an improper paraphrasing of the New School's By–Laws; allegedly improper descriptions of the appointments received by Dr. Herbert Schlesinger and Dr. Jerome

Bruner at age 70; and an alleged understatement of the number of female professors who were promoted to full professor.

Plaintiff concedes to having erred in identifying the status of certain professors, and interpreting the New School's by-laws. However, she maintains that her position on the other three factual matters is at least arguably true.

Of course, it is not appropriate for me to resolve factual disagreements at the *in limine* stage; these are matters for the jury to resolve at trial. Therefore, I will treat whatever disagreements remain as refusals by the parties to stipulate. The New School will have an opportunity to show that plaintiff's version of the facts is "demonstrably false" at trial.[2]

*Letter from Janice Goodman to President Fanton*

Janice Goodman, attorney for the plaintiff, wrote a letter to President Fanton prior to the commencement of this lawsuit urging the school to reconsider its decision to force Pollis into retirement. This letter is one of defendant's proposed exhibits. Plaintiff seeks exclusion of the letter on the following three grounds: (1) that it is irrelevant, since it is merely a lawyer's rendition of the facts; (2) that it is inadmissible hearsay; and (3) that it is an inadmissible offer to compromise. At this time, I am unable to rule on these issues since it is not clear what defendant intends to prove with this evidence. Therefore, I reserve judgment on the admissibility of this letter until defendant requests that it be introduced into evidence at trial.

*Substitution to Plaintiff's Witness List*

■ One of plaintiff's witnesses, Professor John Iatrides, has become unavailable to testify at trial. Professor Iatrides, an expert in Greek political studies, was designated to testify to Pollis's scholarship in this field. Plaintiff has suggested Professor Van Coufoudakis, another expert in Greek political studies, as a substitute witness for Professor Iatrides.

---

**2.** As to the final statistical disagreement over how many female professors were granted full professorship, I assume that my specification of the relevant universe for the equal pay claims will clear up the matter. If for some reason it does not, that, like the other disputed factual assertions, will be an issue for trial.

Defendant resists this substitution, but provides no principled reason for doing so. Indeed, allowing the substitution would not threaten prejudice to the New School at trial. Professor Iatrides was never deposed, nor was he the subject of any other pre-trial discovery. Moreover, the nature of his proposed testimony and Coufoudakis's are similar in scope and subject matter. Therefore, I do not feel that it would work undue prejudice to the New School to allow the proposed substitution at this date.

*Additions to Plaintiff's Exhibits*

■ Plaintiff intends to introduce additional charts not specified in her proposed pre-trial order now that she has received my ruling on the appropriate universes for consideration. Defendant feels that the introduction of new statistical data at this time will unduly prejudice its right to a fair trial.

I find plaintiff's request entirely reasonable, and will allow the parties to submit new charts now that the proper universe for each claim has been identified. One cannot expect the parties to decide how they will present statistical data until the universe from which that data will be culled is delineated.

I fully expect each party to submit its new and revised charts to the other party as far in advance of trial as possible, so as to avoid any possible prejudice to the receiving party.

*Newly–Created Documents*

Defendant proposes to introduce into evidence new vitae for certain professors. *See* Defendant's Proposed Pre–Trial Order, Exhibits YYY, ZZZ, AAAA, and BBBB. These new *vitae* purport to update older ones that were previously received by plaintiff in the course of discovery. Plaintiff objects to the introduction of these updated *vitae* on three grounds. First, plaintiff contends that the *vitae* were not created by the New School in the ordinary course of business, but rather were created solely for the purposes of litigation. Thus, under plaintiff's view, they are inadmissible hearsay.

The updated *vitae* are presumably being offered for the truth of their contents. They are accordingly hearsay declarations. The New School, as proponent of the evidence, bears the burden of pointing to an applicable

exception to the rule. Defendant's counsel apparently relies on Rule 803(6), Fed. R.Evid., but the exception would not apply if counsel took the initiative in obtaining the updates for litigation purposes, a scenario not inconsistent with counsel's own account. *See* Defendant's Letter Brief dated December 15, 1995 at 4 n. 2. Admission of these *vitae* will depend upon defendant making a stronger showing that the documents fall within Rule 803(6).

■ Plaintiff's other objections to the admission of the *vitae* lack substance. She claims that the new *vitae* are irrelevant because they had no bearing on the New School's previous salary decision. However, the matters contained in the new *vitae* — namely, the professor's qualifications—presumably affected each professors' salary. Therefore, they are relevant to demonstrate the qualifications of each professor when salary determinations were made.

■ Finally, plaintiff argues that it is prejudicial for defendant to produce these documents on the eve of trial. Again, I do not agree. The professors described in these new vitae have already been the subject of extensive discovery. Moreover, there is no suggestion by the plaintiff that these documents are too voluminous to sort through in the remaining two weeks before trial.

*Course Catalogues*

■ The New School names as exhibits course catalogues for various colleges and universities, other than the New School, for their 1995–96 terms. *See* Defendant's Proposed Pre–Trial Order, Exhibits VVVVV, WWWWW, XXXXX, YYYYY, AAAAAA, and BBBBBB. Plaintiff argues that these catalogues are irrelevant hearsay.

Defendant has not even attempted to demonstrate the relevance of these catalogues, and I cannot independently discern a way in which they will affect the issues in the present case. Therefore, without deciding whether they are hearsay, I preclude the catalogues as irrelevant.

■ The New School also seeks to introduce as a trial exhibit its own faculty bulle-

tins from the years 1988 through 1996. *See* Defendant's Proposed Pre–Trial Order, Exhibit BBBBBB. Plaintiff claims that bulletins from 1994 to 1996 are irrelevant because Pollis left the faculty in 1994. However, some dispute exists as to whether Pollis is listed as a member of the full-time graduate faculty in these catalogues. They are therefore relevant, and I will admit them.

### Affidavits

■ Plaintiff asks that I preclude defendant's proposed exhibits LLLLLL, MMMMMM, NNNNNN, and PPPPPP because they are irrelevant to the present litigation. These exhibits consist of affidavits submitted by Pollis in support of her motion for preliminary injunction and in opposition to defendant's first motion for summary judgment. Defendant may offer affidavits by Pollis herself as admissions of a party opponent, assuming that they address relevant issues.

■ According to plaintiff, these affidavits pertain primarily to her age discrimination claim, which I dismissed in a prior opinion. But these affidavits contain some factual assertions which are relevant to the present litigation. Specifically, affidavits executed by Pollis contain allegations of both sex and age discrimination, as well a detailed account of her academic credentials. I decline to exclude them, at least to that extent.

### Deposition Transcripts

Defendant proposes introducing transcripts from the depositions of Alan Wolfe, Richard Gaskins and Peter Juviler. *See* Defendant's Proposed Pre–Trial Order, Exhibits QQQQQQ, RRRRRR, KKKKKK. Plaintiff objects, stating that "[t]here is no basis under Federal rules to allow the admission of these deposition transcripts by defendant."

Fed.R.Civ.P. 32(a) governs the use of depositions at trial. Their admissibility depends upon the particular circumstances of the deponent, which are not fully revealed in the present record. Decision as to these depositions is reserved. If defendant offers them, it must satisfy Rule 32(a)(3).

If one or more of these individuals testifies at trial, the prior depositions may be used for impeachment. Fed.R.Civ.P. 32(a)(1).

### Documents Pertaining to the 1974 Charge

■ Pollis seeks to exclude two proposed exhibits pertaining to the 1974 wage discrimination charge. The first of these, which Pollis claims is irrelevant, is a statement by her discussing the nature of the prior charge. *See* Defendant's Proposed Pre–Trial Order, Exhibit GGGGG. The second, which plaintiff claims is irrelevant and hearsay, is a New York City Commission on Human Rights ("NYCCHR") investigator's memorandum.

According to plaintiff, both documents are irrelevant because she is not asserting equal pay claims that arose prior to 1974. Defendant contends that these documents are relevant in the following two respects: (1) they tend to demonstrate that plaintiff slept on her rights for 19 years; and (2) they show that plaintiff had previously filed a meritless claim.

In my opinion of December 28, 1995, I held that Pollis's alleged awareness of possible wage discrimination in 1974 is irrelevant to her right to recovery on a continuing violation theory. *See* Op. at p. 788 n. 11. Her letter, which is introduced to demonstrate such awareness, is therefore excluded as irrelevant.

Assuming without deciding whether the NYCCHR memorandum is admissible hearsay under the rules of evidence, *see* Rule 803(8)(C), it has no impact on the present case, since plaintiff does not seek recovery for claims arising prior to 1974. Indeed, it might prejudice the plaintiff's case by suggesting to the jury that claims arising after 1974 are without merit.

Accordingly, I exclude both documents pertaining to Pollis's 1974 charge.

The foregoing is SO ORDERED.